STRONG and another *against* BENEDICT and others.

*A.* having the exclusive right to take water from a certain pond, and being the owner of the land at the out-let thereof, and on both sides of the stream issuing therefrom, as also of a dam on that stream, and of a grist mill propelled by water diverted from the stream, by means of such dam, in *June*, 1767, conveyed four acres of such land, including the site of the grist mill, to *B.*, who owned another grist mill on the same stream below, with the whole privilege of the stream, so as to take the whole benefit of the water for the grantee's mill, or other mills that might be built on the land. *B.* immediately took down and carried away the first mentioned mill, to aid in rebuilding his mill below; and in *March*, 1768, when there was no mill of any kind on the land, he conveyed the same four acres to *C.*, with the privilege of building a fulling mill, together with the privilege of drawing water from the pond, so much as should be necessary to carry a good, well-built over-shot fulling mill, when he, the grantee, should have occasion to use his said fulling mill. In *June*, 1768, *B.* conveyed his grist mill to *D.*, with all the privilege he had in the stream and dam, and of drawing water from the pond. After *C.'s* purchase of the four acres, he erected thereon a fulling mill, propelled by water taken from the dam, which was used for several years, but had gone down before *September*, 1791, when *C.* conveyed the land to *E.*, with the privileges and appurtenances thereunto belonging. In 1799, *E.* built an oil mill on the site of the fulling mill and the former grist mill, which was propelled by water, taken in the same manner it had been for those mills, and returning into its natural channel before it arrived at the grist mill below. Held, 1. that *B.*, by his deed to *C.*, granted the use of the water for a *specific purpose* only, *viz.* that of propelling a *fulling* mill, and not the use of a certain *quantity* of water without regard to its application, and consequently, that *E.*, the grantee of *C.*, had no right to keep up the dam for the use of his *oil* mill; 2. that the grantee of *D.* might lawfully remove the dam, doing no unnecessary damage, so as to prevent the flowing of the water to such oil mill, and suffer it to run, in its natural course, to his own grist mill.
In the construction of a grant, the situation and circumstances of the parties, may be properly taken into consideration.

This was an action of trespass, alleging, that the plaintiffs, on the 4th of *December*, 1821, owned and possessed an oil mill, in *Salisbury*, upon a stream of water running out of *Long-pond*, and a dam upon said stream, made and used by the plaintiffs, for the purpose of conducting water from said stream to the said oil mill, to propel the same; and that the defendants, with force and arms, broke down and entirely destroyed the said

dam ; whereby the plaintiffs were greatly injured, and their said oil mill rendered useless.

The cause was tried, on the general issue, at *Litchfield*, *August* term, 1823, before *Peters*, J.

The dam mentioned in the declaration, called the *little dam*, was built by *James Landon* and others, for the purpose of diverting the water from the stream to a grist mill, then standing where the plaintiffs' oil mill stands ; and has been supported and repaired, by the plaintiffs, and those under whom they claim, to propel such oil mill, and other mills on the same site, when in use. The defendants, being the owners of a grist mill below, took up the gate at the *East* end of the little dam, which was covered with gravel, and thereby diverted the water from the plaintiffs' oil mill, and suffered it to run in its natural course from *Long-pond* to the grist mill of the defendants ; in doing which, they did no more damage to the dam than was necessary for this purpose.

At the out-let of *Long-pond* was a dam, called the *upper dam*, about twenty rods above the dam described in the declaration ; from which the water flowing into the latter dam was taken ; and after being conducted to the plaintiffs' oil mill, and passing it, it returned into its natural channel, before it arrived at the defendants' grist-mill.

The plaintiffs claimed the right of erecting and keeping up the little dam, and of taking water therefrom to propel their oil mill. The defendants claimed the exclusive right to the whole of the water for the purposes of their grist-mill ; and that the little dam was an obstruction to such right. On this ground, they justified the acts complained of in the declaration.

Previous to the year 1767, the exclusive right of taking water from *Long-pond*, and from the little dam, was owned by *James Landon*, *James Landon* jun. and *Thomas Landon*, who, at the same time, owned the land at the out-let of *Long-pond*, and on both sides of the stream, until it came to a piece of land, on which the defendants' grist mill now stands, lying some distance below the plaintiffs' oil mill, then owned by *Matthias Kelsey*. At the same time, the *Landons* owned a grist mill, standing where the plaintiffs' oil mill stands, propelled by water taken from the little dam.

The plaintiffs, in support of the right claimed by them, adduced in evidence the following documents. 1. A deed from the *Landons* to *Matthias Kelsey*, dated *June* 25th, 1767, of four acres of land on both sides of the stream, on which said grist

mill then stood. This deed conveyed, with the land, "the whole privilege of the stream, to dam the same, both where said mill stands, and above, and to dig (if need be) so as to take the water out of said *Long-pond*, so as to take the whole benefit of the water for said mill, or other mills that may be built on said four acres." 2. A deed from *Kelsey* to *Jabez Griswold*, dated *March* 19th, 1768, of the same four acres of land. This deed conveyed with the land "the privilege of building a mill for the purpose of fulling cloth, commonly called a fulling mill, together with the privilege of drawing water from the *Long-pond*, so called, in *Salisbury*, so much as shall be necessary to carry or draw a good, well-built over-shot fulling mill, at any time, when he, the said *Griswold*, shall have occasion to use his said fulling mill." 3. A deed from the heirs of *Griswold* to *Nathan Landon*, dated *September* 2nd, 1794, of the same land, " with the appurtenances and privileges thereunto belonging." The plaintiffs are the owners of the land thus conveyed to *Nathan Landon*, and have all the rights and privileges in relation to the dam and the use of the water, which he had.

While *Griswold* owned the land, he erected on it, where the plaintiffs' oil mill now stands, a fulling mill, which was propelled by water, taken from the little dam, and was used by him, during his life, and by his heirs, after his death, for several years, but which was not in existence when his heirs made the conveyance to *Nathan Landon*.

Before the execution of *Kelsey's* deed to *Griswold*, and immediately after his purchase of the *Landons*, *Kelsey* took down and carried away the grist mill, to aid in rebuilding a grist mill owned by him below; and at the date of *Kelsey's* deed to *Griswold*, there was no mill of any kind on the four acres. In the year 1799, *Wardwell* and *Benjamin*, who then owned the four acres, erected the oil mill now owned by the plaintiffs, on the same spot where the grist mill of the *Landons*, and the fulling mill of *Griswold*, had stood; and the place from which the plaintiffs claim the right to take the water to propel their oil mill, is the same place from which it was taken for such grist mill and fulling mill.

The defendants, to establish their exclusive right to the whole privilege of the water, introduced a deed from *Matthias Kelsey* to *Phinehas Rowley*, dated *June* 13th, 1768, conveying to him the grist mill now owned by the defendants, and all the privilege the grantor had in the stream and dams, and of drawing

water from *Long-pond*. The defendants have all the rights and privileges in relation to the use of the water, which *Rowley* obtained by virtue of this deed.

Upon these facts, the judge instructed the jury, that the plaintiffs, by virtue of the deeds from *Kelsey* to *Griswold*, and from the heirs of *Griswold* to *N. Landon*, had no right to take the water, by means of the little dam, for the use of their oil mill: and that the defendants had right to prevent the same, doing as little damage as possible to the little dam, so that the water might pass, in its natural course, to their grist mill. The jury returned a verdict for the defendants; and the plaintiffs moved for a new trial, on the ground of a misdirection.

*Church* and *J. W. Huntington*, in support of the motion, contended, That by virtue of the deeds from the *Landons* to *Kelsey*, from *Kelsey* to *Griswold*, and from the heirs of *Griswold* to *Nathan Landon*, upon the facts of the case, the plaintiffs acquired a right to use the little dam, for the purpose of propelling their oil mill. They particularly insisted,

1. That the words of the deed from *Kelsey*, creating the right to draw water from the *Long-pond*, were a mere description of the *quantity* of water which might be used, not of the *purpose* to which it was to be applied. *Kelsey* was unwilling to part with the *whole* stream, or to make his grant so *general* as to impede the operation of his works below; but he was willing to dispose of the use of a part of this water; and for this purpose, he had reference to the only standard, by which it could be ascertained, *viz.* a sufficiency to create *a power* of a certain description. In this way alone could he dispose of the use of any part of the stream. He could not do it by metes and bounds,—by length of line and point of compass,—or in any other practicable mode.

There is nothing in the terms of the grant, which shews any object in *Kelsey* to have a *fulling* mill erected. Then, why should the court confine the grant to that object alone? Had the words been merely *so much water as is necessary to carry a fulling mill*, it would hardly be claimed, that they would have confined the use to a mill of that description. But what are the words? "*As much* as shall be necessary to carry or draw a well-built, over-shot fulling mill." Having previously spoken of a fulling mill, the grantor intended to give the grantee a sufficiency of water to carry it; and therefore, he limited the grant, by that standard, which might so easily be ascertained. As he

*Litchfield*,
June,
1824.

Strong
*v.*
Benedict.

could not intend to limit the grant of the land to the erection of a fulling mill only ; so he could not, and did not, intend to limit the use of the water to that object. The remaining words are " at any time when he shall have occasion to use his said fulling mill." These words furnish no evidence of any other intention, than what is to be inferred from the preceding words. *Luttrel's* case, 4 *Co. Rep.* 86. *Biglow* & al. v. *Battle* & al. 15 *Mass. Rep.* 313. *Saunders* v. *Newman,* 1 *Barn. & Ald.* 258. 262.

If the words of a grant are doubtful, and admit of two constructions, they must, according to a well known principle, be taken most strongly against the grantor, and in favour of the grantee. 1 *Selw. N. P.* 265. *Jackson* d. *Troup* & al. v. *Blodget,* 16 *Johns. Rep.* 172. 178.

2. That if the words used in this deed should be deemed a limitation of the use of the water to a *fulling* mill, they extend no further than to the drawing of the water from the *Long-pond,* and not to the drawing from the little dam. On this point the deed admits of no doubt. If so, then as to the right of taking the water from the little dam, there is no limitation ; and it passed as an *appurtenance* to the property conveyed ; *Kelsey* having conveyed the four acres on which the plaintiffs' oil mill stands, " with the *appurtenances* thereof." What were they ? They are to be ascertained, by a recurrence to the facts of the case. At the time when the *Landons* owned the four acre lot, and sold it to *Kelsey,* a grist mill was standing where the oil mill of the plaintiffs now stands, and the little dam was used for the purpose of propelling it. *Kelsey* pulled it down, previous to his conveyance to *Griswold,* who erected a fulling mill, which was not in existence at the time of the grant by his heirs to *N. Landon.* These facts present the question, whether a grant of a tract of land, which has been used as a site for a mill, " with the appurtenances thereto belonging," conveys a right to use the water from a dam then standing on the land of the grantor, which had, before the grant, been used for that purpose. Now, if at the time of *Kelsey's* grant, the oil mill had been standing, and had been conveyed, in terms, with the addition of the words—*appurtenances and privileges,* it could not be doubted, that the right to draw the water from the little dam, to propel it, would have been conveyed ; for, without it, the *mill,* which is the principal thing, would have been *useless.* But the fact that no mill was then standing, cannot alter the principle. It was a site for one ; it had been used as such ; and the little

Litchfield,
June,
1824.

Strong
v.
Benedict.

dam was erected, and was then in existence, for that purpose alone. The grant of the land empowered the grantee to erect the mill; the appurtenance to it was the little dam, which had been previously used to propel it. *Whalley* v. *Tompson & al.* 1 *Bos. & Pull.* 371. 375, 6. *Nicholas* v. Sir *John Chamberlain,* *Cro. Jac.* 121. *Pickering* v. *Staples,* 5 *Serg. & Raw.* 107.

3. That the plaintiffs were entitled to draw water from the upper and lower dam, for the use of their oil mill, by virtue of the deed from the *Landons* to *Kelsey,* in connexion with *Kelsey's* deed to *Griswold.* By the first deed, the four acre lot is conveyed to *Kelsey,* with a right to take the benefit of the water for the use of the mill then standing, or *other* mills, which might be built thereon; and *Kelsey* conveyed the same lot, with all the *appurtenances* belonging to it; of which one was a right to the water for the use of *any* mills, which might be erected. At any rate, the plaintiffs had a right to the *dam,* for the purpose of a *fulling* mill. This, it is not claimed, they have lost. They, of course, could build one; and their not having built one, gave no right to the defendants to tear down the dam.

Further, the charge was wrong, upon the facts of the case; because the plaintiffs own the oil mill, and the land covered by the water adjoining it; and the water which is taken out of the little dam, supported and repaired by them, to propel the mill, passes into the natural channel before it reaches the mill of the defendants below. Of course, the defendants can suffer no other injury than that which arises from a temporary obstruction and evaporation, which is no *legal* injury. *Palmer & al.* v. *Mulligan & al.* 3 *Caines* 307. *Platt* v. *Johnson & al.* 15 *Johns. Rep.* 213. 218, 9. *Weston* v. *Alden,* 8 *Mass. Rep.* 136.

*Benedict* and *A. Sterling,* contra, remarked, that in determining what passed by a grant, it is material to consider the state of the property, and the situation of the grantor. 2 *Term Rep.* 503. When *Kelsey* purchased of the *Landons,* in *June* 1767, he owned the lower mill, which the defendants now own; and his object was, to obtain the full and entire controul of the stream, for the benefit of that mill: For immediately on obtaining the title, he took down the grist mill, which stood where the plaintiffs' oil mill stands, and with it repaired his other one; and when he conveyed to *Griswold,* in *March,* 1768, only nine months after he made the purchase, there was no mill there. He

would not, therefore, knowingly do any thing to the injury of the lower mill. They then contended,

1. That the grant from *Kelsey* to *Griswold*, gave him a right to erect a single fulling mill only. The words are "*a* good, well-built over-shot fulling *mill*;" and "his *said* fulling *mill*." It would require a very forced construction to make this language mean an indefinite number of mills.

2. That the right conferred was a *personal* privilege, confined to the grantee, so that it could not be transferred, and ceased at his death. By the terms of the grant, the privilege was to be exercised "at any time, when *he*, the said *Griswold*, should have occasion to use *his* said fulling mill." 2 *Bla. Comm.* 356. *Nichols* v. *Gates* & al. 1 *Conn. Rep.* 318. *Rutty* v. *Shaler* & al. 3 *Day* 470.

3. That the right conferred was, moreover, the use of water for a *specific purpose, viz.* to propel a *fulling* mill, and not the use of a certain *quantity* of water for *any* purpose. The terms of the grant are very explicit; " the privilege of drawing water from the *Long-pond,* so much as shall be necessary to carry a good, well-built over-shot *fulling* mill, at any time when he shall have occasion to use his *said fulling* mill." A fulling mill is in use only a part of the season ; and when the water, in this case, was not in use for that purpose, it remained to the grantor. By changing the application, an *occasional* use is transformed into a *constant* one ; and the water may be applied to purposes wholly inconsistent with the *interests*, as well as the *convenience*, of the grantor. *Biglow* & al. v. *Battle* & al. 15 *Mass. Rep.* 313.

4. That whatever construction may be put upon the deed from *Kelsey* to *Griswold*, still the privilege claimed by the plaintiffs, was not conveyed by the deed from *Griswold's* heirs to *Nathan Landon.* Here it should be observed, that at this time, the fulling mill had run down, and there was no mill, of any kind, on the land. Then, in the first place, the deed in question conveys only the *land*, and is silent as to any *easement.* Secondly, though this land might be conveniently situated for mills, by taking the water through other lands above ; yet unless it appears from the instrument of conveyance to be sold as a *mill-seat,* and had in fact an *easement* annexed to it, seen to be in existence at the time, and necessary to the use of the property, in the particular manner, nothing would pass but the land. When *N. Landon* purchased this land, he saw no water running on to it from any dam ; there was no mill upon it ; and it does not appear, that

at the time of the purchase, he had it in contemplation to erect a mill at the place, or to use it for any such purpose. As well might it be claimed, that a *spring* or a *conduit*, on other lands, to which resort had been had, should pass as *appurtenant* to the land. *Thomson* v. *Gregory*, 4 *Johns. Rep.* 81. *Leonard* v. *White*, 7 *Mass. Rep.* 6. 8. *Com. Dig. tit.* Appendant and Appurtenant. D. *Beaudely* v. *Brook*, *Cro. Jac.* 189.

The plaintiffs founded their right to divert the water out of its natural course, by a right derived from their *deeds*, and not on the ground that their manner of using it was not prejudicial to the defendants. They justified the trespass on that ground; and offered evidence to shew, that it was an interruption and injury. It was not necessary, therefore, for the judge to say any thing to the jury on that subject.

HOSMER, Ch. J. The plaintiffs are the owners of a tract of four acres of land, with an oil mill upon it, and likewise of a dam across a stream of water, called the *little dam*; and they claim, that the defendants tore down the dam, and, by privation of the water, rendered their oil mill useless.

It appears, that the defendants took up the gate at the *East* side of the little dam, and diverted the water from the plaintiffs' oil mill, permitting it to run in its natural channel to the defendants' grist mill; but the plaintiffs' right to the water, for the purpose of working the oil mill, they deny.

In the trial of the cause, many facts were proved and questions made, which it is unnecessary to notice. I shall only select those, on which the title of the plaintiffs, in my view of the subject, entirely depends.

In the year 1767, *James Landon* and others owned the land on both sides of the brook before-mentioned, from the *Long-pond*, whence it issued, to below the plaintiffs' oil mill, and still further down to the land then owned by *Matthias Kelsey*, on which a grist mill was erected, now the property of the defendants.

The brook, in its natural course, ran to the grist mill of *Kelsey*; but the *Landons*, then the owners of the land on which the plaintiffs' oil mill is, by means of the little dam and a sluice-way, took the water, which they thought necessary to move a grist mill, erected on the precise site where the present oil mill stands. The importance to *Matthias Kelsey* of having the controul of the little dam, to prevent the diversion of the water from his grist mill, is so obvious, that no one can be at a loss for

his motive in taking effectual measures for that purpose. Accordingly, in *June*, 1767, he bought of the *Landons*, and had conveyed to him by deed, the four acres of land now owned by the plaintiffs, with the little dam, and the whole privilege of the stream, from the *Long-pond*, for the grist mill on the land last aforesaid, or other mills that he might think proper to erect. Immediately after this, he took down the grist mill on the four acres, to assist in rebuilding the mill below, which now is owned by the defendants. Having accomplished this object, and, as the facts demonstrated, not wishing to retain the four acres of land, he, when there was no mill thereon, in *March*, 1768, sold the said land, by deed, to *Jabez Griswold*, in fee-simple, with the usual covenants of seisin and warranty, and likewise granted in the deed the privilege of building a mill for the purpose of fulling cloth, commonly called a fulling mill, with the privilege of drawing the water from the *Long-pond*, as much as should be necessary to carry a good, well-built over-shot fulling mill, at any time when he should have occasion to use said fulling mill. A fulling mill was erected, by *Griswold*, and used by himself, and afterwards by his heirs ; but before 1791, the mill had gone down ; when the heirs of *Griswold* conveyed the four acres to *Nathan Landon*, under whom the plaintiffs claim title. After the fulling mill was prostrated, it does not appear, that there was any other erection, until the oil mill was built, in 1799. As early as *June*, 1768, *Matthias Kelsey* granted, by deed, the grist mill now owned by the defendants, with the privilege of the stream, and of drawing water from *Long-pond* ; under which grant the defendants have acquired title.

The jury were charged, that the plaintiffs, by means of the little dam, had no right to take the water for the use of their oil mill ; and that the defendants had right to prevent the same, doing as little damage as possible to the little dam, so that the water might flow on, in its natural channel.

Two enquiries arise in this case ; whether the plaintiffs have title to the water in question for the use of their oil mill ; and if they have not, whether the removal of the gate of the little dam was a trespass.

1. From the unlimited nature of the grant, by the *Landons*, to *Matthias Kelsey*, he, undoubtedly, had right to erect an oil mill where the one owned by the plaintiffs now stands, and to appropriate as much water, by means of the little dam, as he might think expedient for its use. Had he erected one, and then granted the land, with its privileges and appurtenances,

the right to the water, which is an incorporeal hereditament, unquestionably would have passed. Nor am I disposed to deny, that a general grant of the land, with its appurtenances and privileges, although there was no mill upon it, would have conveyed the water, as extensively, as it was vested in *Kelsey* under the deed from the *Landons*. It must, however, be admitted, that the attachment of the privilege to the land was not indissoluble. *Kelsey* might legally release the water privilege, or grant it to another, or reserve it for the use of his grist mill below. I think it as little liable to doubt, that the words "privileges and appurtenances," *may* transmit an existing right to water, as they certainly *may* convey an existing right of way. *Whalley* v. *Thompson*, 2 *Bos. & Pull.* 371. But if the right is not extinguished or released, it must ever be a material question, whether the grantor conveyed it, or reserved it for his own advantage. The *intention* of the parties is to be ascertained, by a construction of the grantor's deed, in reference to the subject matter. Had *Kelsey* expressly reserved the little dam, and the water privilege in his deed, it could not bear a question, whether it was conveyed to the grantees ; and as little questionable is it, if the reservation is apparent from a legal construction of the instrument.

The general question is, whether *Kelsey*, by his deed, granted the privilege of the water for a particular purpose only ; so that not only was there a limitation of the quantity, *but likewise of the use*. I will first attend to the construction of the deed, *per se* ; and then, with reference to the known condition and particular situation of the grantor.

The grant of *Matthias Kelsey* is of a four acre lot, with the privilege of building a fulling mill, and of taking water, " as much as shall be necessary to carry on a good well-built overshot fulling mill, at any time, when he, the said *Griswold* should have occasion to use the fulling mill." That the parties contemplated the erection of a fulling mill, the supply of which, with the requisite water, was the material motive to the grant of the privilege, strikes the mind with great force. *Griswold* was to have so much water as was necessary,—When? The grant furnishes a precise answer, in the following words : "when he shall have occasion to use the fulling mill." It would seem, therefore, as if there was a limitation of the *use*, as well as of the quantity. It is true, there are cases, which appear to consider the quantity, as the material object of such a grant as the preceding, and the use as unimportant. *Luttrel's* case, 4 *Co.*

*Litchfield,*
*June,*
*1824.*

Strong
*v.*
Benedict.

36. *Saunders* v. *Newman,* 1 *Barn. & Ald.* 258. *Biglow & al.* v. *Battle* & al. 15 *Mass. Rep.* 313. But in all the cases, it is decided, that although the precise manner of using is not supposed to be defined, yet the application *must create no prejudice to the grantor.* A sound consideration of this principle, would, in general, seem to be at war with the determinations alluded to; for prejudice, when the use is varied, will almost inevitably be the result. Let the principal case under discussion, be recurred to, for illustration. A person grants water sufficient to subserve the use of a fulling mill; and it is claimed, that any other mill may be erected, and receive the water, if it do not take *a greater quantity,* than would be necessary for the use of a fulling mill. How is this quantity to be ascertained? An oil mill may run during the year; while a mill of the other description may require working during the fall months only. A mill of the former kind, the owner may supply with materials, so as to allow of no cessation in its movement; but the latter is dependant on the public exigencies, and must stop when there is no custom. The unwearied and sleepless vigilance of the grantor, to prevent an abuse of the privilege, is insufficient; as neither he, nor his grantor, can, by possibility, ascertain when the quantity is exceeded, unless the excess be very palpable. This principle of construction, is founded in uncertainty, and must be preeminently a source of litigation. It is much preferable, to let the parties explain themselves, in explicit language, and, at least, not to assume voluntarily as a rule, one that must be productive of controversy, and probably injustice.

Without the expression of a definitive opinion on this subject, I have no doubt, that the condition and situation of the parties, and other collateral facts known to them both, may properly be recurred to, to ascertain their mutual intention. This is not a novel principle; but frequently has been recognized and applied. Courts of law, as well as courts of equity, will admit evidence of the situation and circumstances of the parties, for the purpose of assisting them in putting a construction on a will. *Masters* v. *Masters,* 1 *P. Wms.* 420. *Doe* d. *Barns* & al. v. *Provost & al.* 4 *Johns. Rep.* 6. See the cases cited 1 *Phill. Ev.* 417. in note; likewise 6 *Cruise's Dig.* 158. In the case of *the King* v. *Laindon,* 8 *Term Rep.* 379. evidence was received to ascertain an independent fact, in order to aid in the construction of an agreement.

Under the guidance of the preceding principles, I will recur to the condition and circumstances of the parties, at the execution of the deed. *Matthias Kelsey* was the owner of a grist mill below the little dam, for which the stream from the *Longpond* was required. He wanted the water, and he wanted custom. To obtain the former, he made a purchase of the *Landons* of the four acres beforementioned, and of a water privilege; and by this measure, he secured for his grist mill the use of the whole stream. It is a fair presumption, that he had more water than his mill demanded, as he soon sold the four acres, having first destroyed the grist mill erected thereon, and granted as much water as was necessary for a fulling mill. That a mill of this description, in general, requires less water than a grist mill, is indisputable. Thus much *Kelsey* supposed he could spare, without injury to his mill. But what motive, it may be asked, had he to prescribe the *use* of the water? The answer is obvious. By this means, he gains a precise standard, to estimate the quantity of water to be taken; but more particularly, he prevented all possible competition with his grist mill, by the erection of one contiguous to him on the land granted to *J. Griswold.* This, I make no doubt, was the material motive to his contract, and occasioned his permitting a fulling mill, built on the land granted by him, to be furnished with a competent supply of water. The *practical* construction of the grant harmonizes with this exposition. A fulling mill was soon erected, and remained in use for a number of years; and the oil mill first sprang into existence, in 1799. *Livingston* v. *Ten Broeck*, 16 *Johns. Rep.* 14.

If it be said, the plaintiffs have not erected a grist mill, but an oil mill only, it may be conclusively replied, if they can take the water for an oil mill, they may for a grist mill, because, on this construction, *the quantity*, not the use, is prescribed.

On the whole, I am clear, that *Matthias Kelsey* meant to prescribe the *use* of the water privilege, as well as the quantity of water; and that the residue of the water privilege, he chose to retain in his own hands. It follows, that the plaintiffs have failed in sustaining their title to the water in question.

2. That the defendants were authorised to remove the dam, doing the least possible damage, in order to enjoy their right in the stream of water, is too obvious to be made a serious question. *Sic utere tuo, ut alienum non lædas,* is an established principle; and the keeping up a dam across a stream, where the plaintiffs

*Strong*
*v.*
*Benedict.*

had no mill, for the use of which they legally might take the water, was an unlawful act, and injurious to the defendants.

It was not necessary, that the defendants should have proved, that they were actually damnified, by the obstruction of the water; although, if this had been requisite, it appears, with reasonable certainty. If no damage in fact had accrued, the defendants were justified in using the preventive remedy of abating the nuisance; and were not obliged to suspend operations, until there was a deficiency of the water. Nor can the plaintiffs be permitted, for a moment, to obstruct the flowing of a stream, to which, *at present*, they have no possible claim.

I would not grant a new trial.

PETERS, BRAINARD and BRISTOL, Js. were of the same opinion.

New trial not to be granted.