WILLIAM W. HARTWELL AND EBENEZER S. WINSLOW, RESPONDENTS, *v.* THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK AND THE EQUITABLE LIFE INSURANCE SOCIETY OF THE UNITED STATES, APPELLANTS, IMPLEADED WITH OTHERS.

*Grant of water rights — an action to determine the rights of several separate owners cannot be maintained unless some infringement of the rights of the plaintiffs is proved — evidence that the defendants' predecessors or their tenants had infringed on the plaintiffs' rights is incompetent — a grantee of a fixed supply of water is not obliged to reduce the quantity because modern appliances give equal efficiency to a smaller volume — rule for computing the quantity of water discharged through spouts at a certain head, stated — when a grant of water, giving the exclusive privilege of grinding grain at a grist-mill, will not restrain the grantee from using the water for other purposes.*

In an action brought by the plaintiffs, as owners of a water privilege at the lower dam in the village of Plattsburgh, against the owners and occupants of the other water privileges at that dam, to obtain a judicial construction of the grant under which all of the parties claimed, and to determine the quantity of water to which the plaintiffs were entitled, and to protect them in the use and enjoyment of their rights as such owners; no proof was given upon the trial and no finding was made by the referee that the defendants had infringed upon or threatened to infringe upon the plaintiffs' rights and privileges.

The referee found that uncertainties and differences existed among the several owners and occupants of water rights at said dam with respect to the extent of the several rights, estates and duties created by or derived from the said conveyance, and that by reason of them the plaintiffs were sometimes deprived of the full enjoyment of the use of the water to which they were entitled, and suffered injury in consequence, but he awarded no damages or injunction but simply declared the respective rights of the parties in and to the water power.

*Held,* that, as the plaintiffs made no claim for damages already suffered, and proved no injury impending or threatened by the defendants, there was no occasion for the court to adjudicate upon the respective rights of the parties.

Only two of the defendants appealed, one alleging, by way of counter-claim, that the plaintiffs had, by their wrongful acts, deprived the said defendant of its proper allowance of water, and asking for damages for the injury, and also alleging that the said defendant and its predecessors in title had for more than twenty years openly, and with a claim of right, used all the water of which the plaintiffs complained, asked that the rights of all the parties be fixed and determined, and that the plaintiffs be enjoined from further improper use of the water, the other defendant also complained of the excessive use of water by the plaintiffs and prayed that its interests might be protected.

*Held,* that, since the appellants did not choose to confine the litigation to a challenge of the sufficiency of the case presented by the complaint of the plaintiffs, they must be held to have consented to the litigation, and could not after they were unsuccessful in it, be heard to urge that the plaintiffs did not state a case of which the court was bound to take cognizance.

The plaintiffs, in the absence of any evidence that the defendants had infringed upon their rights, were permitted, against the objection and exception of the defendants, to prove that their predecessors in title had done so.

*Held,* that it was error to admit this evidence, as the defendants were answerable only for their own wrongs and not for those of their predecessors.

That it was also error to admit evidence as to the alleged trespass of the tenants of the defendants, as the defendants themselves did not authorize or sanction them.

The main question litigated was in respect to the quantity of water the plaintiffs were entitled to under the deed, which was executed in 1829, in which the provision for the water rights was made, At that time a grist-mill, operating four run of stone, stood upon the premises now owned by the plaintiffs, the head of water through the same being as at the time of the trial; the four run of stone were then operated by tub-wheels propelled by water discharged from rectangular spouts or conductors leading from a flume to the wheels. The grant to the plaintiff was of a supply of water sufficient to operate not exceeding eight run of stone, and the referee found that all the water flowing through the spouts then in use was necessary to operate the four run of stone, and that the quantity to which the plaintiffs were now entitled is the same as it then was, increased by the discharge from four similar spouts.

*Held,* that the plaintiffs were entitled to the quantity thus measured, and that they were not obliged to reduce the quantity because improved modern appliances can give equal efficiency to a much smaller volume of water.

The referee adopted a formula of computing the quantity of water then discharged through the spouts under the given head of water, assuming the appliances to be in good condition after their kind, given by several of the witnesses as follows: Multiply the square root of the number of feet in the head by 8.025, and multiply this result by the square feet of the area of the discharge, and the result is the cubic feet of discharge per second.

*Held,* that this rule was supported by such weight of evidence and authority as to justify its adoption.

The referee found the head to be eleven feet five inches by measuring from the crest of the dam to the middle of the tub-wheel; the center of the discharge from the spouts being at least ten and one-half inches higher.

*Held,* that the clear weight of the evidence, as well as the nature of the case, required the measure to be taken from the center of the orifice of discharge.

That the court strongly inclined, for the same reason, to the opinion that the area of the orifice of discharge should have been reduced by some coefficient of contraction

The grant to the plaintiff, after describing the premises, contains the following provision: "Being the lot on which said grist-mill stands in said village, together

with the exclusive right of, to and in the grist-mill ditch, as designated on said map, * * * with the privilege of taking water thereby for grinding from the mill-pond, for the use of said grist-mill, forever, with the exclusive privilege of grinding grain as purchased at the auction sale of the premises hereinafter mentioned," the premises being conveyed subject to and entitled to all the rights, privileges, conditions, etc., contained in the written terms of sale.

The appellants contended that, by the grant, the plaintiffs were restricted to the use of the water for the sole purpose of grinding grain.

*Held,* that the "exclusive privilege of grinding grain" was not intended as a restriction of the water-power to that purpose, but was a restriction upon the other water-powers granted at the same time.

In addition to the property and water rights granted by the grantors to the plaintiffs, "the exclusive privilege of grinding grain" was granted and the deed conveyed the mill and the water privileges with the monopoly   (INGALLS, J., dissenting.)

APPEAL from a judgment in favor of the plaintiff, entered upon the report of a referee on April 26, 1881, in the office of the clerk of Clinton county.

*Wm. P. Cantwell,* for the appellants.

*S. A. Kellogg,* for the respondents.

LANDON, J.:

This action seems to have been brought and tried upon the theory that, because the different owners of the rights and privileges in and to the water-power of the dam across the Saranac river in the village of Plattsburgh, all derived title from a common source, and did not all agree respecting the quantity of their respective rights and privileges, that it was competent for one owner to bring all the others into court and have the extent, quantity and order of their respective rights and privileges defined and declared. This would be so if there were allegation and proof that one owner was infringing upon the rights of another, and the presence of all the parties was necessary to the determination of the rights of the party alleging and proving the infringement. But there is no proof and no finding that the defendants have infringed or threaten any infringement upon the plaintiffs' rights and privileges.

The referee finds that "uncertainties and differences exist among the several owners and occupants of water rights at said dam with respect to the extent of the several rights, estates and duties created

by or derived from the said conveyance," and he specifies, to some extent, these uncertainties and differences, and then finds, that by reason of them the plaintiffs are sometimes deprived of the full enjoyment of the use of the water to which they are entitled, and suffer injury in consequence; but he does not find, and the proof does not show, that the defendants have done any overt act which has resulted in such deprivation or injury.

The judgment awards no damages or injunction, but declares the respective rights of the parties in and to the water-power.

We are cited to no case which authorizes such an action, but we are cited to cases in which, upon allegation and proof of a trespass by one owner upon the rights of another, the court, as incident to the redress of the wrong done, and to prevent its recurrence, has ascertained and declared the respective rights of the parties. In such cases damages may be awarded as indemnity for the past, and an injunction as security for the future. In such cases the award of a preventive remedy may be much more important than compensation for past injuries. (*Gardner* v. *Village of Newburgh* 2 Johns. Ch., 162; *Olmsted* v. *Loomis*, 9 N. Y., 423.) Here the plaintiffs make no claim for any damages already suffered; they prove no injury impending or threatened by the defendants. There is no occasion for the court to adjudicate upon the respective rights of the parties. Preventive justice may be awarded by courts of equity, but not until the necessity for the award is shown. In cases of trusts the courts frequently, and without any allegation of any actual or threatened infringement of right, interpret the instrument creating it, define the duty of the trustee, and declare the rights of the *cestuis que trust*. But this is peculiar to trusts. The theory is that the trustee is willing to do his duty, but does not know what it is; he has no interest hostile to that of the beneficiaries, and it is better to protect him from error in the first instance, than to expose him to a multiplicity of actions for the correction of his subsequent errors.

Bills *quia timet* were formerly allowed, and actions of that nature are now allowed, but they proceed upon the theory that in the lapse of time the plaintiff will lose the evidence of his rights, and thus his rights themselves, unless he is permitted to make proof of them while proof is obtainable. Nothing of that kind exists in

this case. The rights of the parties here are shown in recorded deeds.

Bills of peace, or actions of that nature, are allowed, but they proceed upon the theory that the plaintiff is harrassed by unnecessary litigation, or is threatened with it, and since he can settle all controversies in one action, he is entitled to peace respecting all the others. No such case is here presented. It may be that the defendants talk, but they neither invade the plaintiffs' alleged rights nor threatened invasion or suits. (*Bailey* v. *Briggs*, 56 N. Y., 407; *Chipman* v. *Montgomery*, 63 id., 230.)

Only two of the defendants appeal. The defendant, the Mutual Life Insurance Company, alleges, by way of counter-claim, that the plaintiffs have, by their wrongful acts, deprived said defendant of its proper allowance of water, and asks damages for the injury, and also alleges that said defendant and its predecessors in title have, for more than twenty years, openly, and with a claim of right, used all the water of which the plaintiffs complain, and asks that the rights of all the parties be fixed and determined, and that the plaintiffs be enjoined from further improper use.

The defendant, the Equitable Life Insurance Company, also complains in its answer of the excessive use of water by the plaintiffs, and prays that its interests may be protected. Since the appellants did not choose to confine the litigation to a challenge of the sufficiency of the case presented by the complaint of the plaintiffs, but embraced the opportunity which the plaintiffs' case afforded them, to present their complaint of the alleged wrongs done to them by the plaintiffs, and also to ask that their rights, as well as those of the plaintiffs, should be ascertained and declared, we must hold that they have consented to the litigation, and cannot, after they have been unsuccessful in it, be heard to urge that the plaintiffs did not state a case of which the court was bound to take cognizance. (*Helck* v. *Reinheimer*, 105 N. Y., 470.)

But we think the record discloses several errors to the prejudice of the defendants which require a reversal of the judgment. The plaintiffs, in the absence of any evidence that the appellants had ever infringed upon their rights, were permitted to prove that their predecessors in title had done so. The appellants were answerable for their own wrongs, but not for those of their predecessors, and the

evidence supporting such wrong-doing was duly objected to, and its admission clearly error. So in respect to the alleged trespasses of the tenants of these appellants. The appellants themselves neither authorized nor sanctioned them, and should have suffered no prejudice upon their account.

The main question litigated was in respect to the quantity of water the plaintiffs are entitled to under their grant. The deeds in which the partition of the water rights was made were executed in 1829. At that time a grist-mill operating four run of stone, stood upon the premises now owned by the plaintiffs. The head of water was the same as now. The four run of stone were then operated by tub-wheels propelled by water discharged from rectangular spouts or conductors leading from a flume to the wheels. The grant to the plaintiffs was of a supply of water sufficient to operate not exceeding eight run of stone. The referee found that all the water flowing through the spouts then in use, was necessary to operate the four run of stone; and that the quantity to which the plaintiffs are now entitled is the same as it then was, increased by the discharge from four similar spouts. We think the plaintiffs entitled to the quantity thus measured, and that they are not obliged to reduce the quantity because improved modern appliances can give equal efficiency to a much smaller volume of water. The problem to be solved was, what was the quantity then discharged through these spouts under the given head of water, assuming the appliances to be in good condition after their kind? The referee determined the quantity of water to which the plaintiffs are entitled, but he does not inform us upon what rule of computation he proceeded. A comparison of the data found by him with the results he established, discloses the fact that he adopted a formula of computation given by several of the witnesses as follows; Multiply the square root of the number of feet in the head by 8.025, and multiply this result by the square feet of the area of discharge, and the result is the cubic feet of discharge per second. We are satisfied that this rule is supported by such weight of evidence and authority as to justify its adoption. The doubt which the evidence suggests in regard to the accuracy of the result announced by the referee is whether he adopted the correct head, and whether he ought not to have reduced the area of discharge by what is termed the coefficient of contraction.

The referee found the head to be eleven feet eight inches. This is obviously found by measuring from the crest of the dam to the middle of the wheel-tub. The center of the discharge from the spouts is at least ten and one-half inches higher. Whether the measure of the head should be made from one point or the other is in dispute upon the testimony, but we think the clear weight of the evidence, as well as the nature of the case, require the measure to be taken from the center of the orifice of discharge. We strongly incline, for the same reasons, to the opinion that the area of the orifice of discharge should have been reduced by some coefficient of contraction. If these views are correct, then the plaintiffs have been awarded more water than is their right.

There was a mass of improper evidence given respecting other mills. The question before the referee was one to be answered by the aid of rules shown to be true by experts in hydraulic science. The defendants should not have been compelled to meet special results in special cases. This error was, in part, obviated by the adoption by the referee of the rule indicated. But this testimony probably led to his adoption of the head which he found, and to his rejection of any coefficient of contraction as applicable to the area of discharge.

The defendants contend that, by the grant, the plaintiffs are restricted to the use of the water for the sole purpose of grinding grain. The language of the grant is set forth in the opinion of Mr. Justice INGALLS. We think that the "sole privilege of grinding grain" was not intended as a restriction of the water-power to that purpose, but was a restriction upon the other water-powers granted at the same time. In addition to the property and water rights granted to the grantors of the plaintiffs, the "sole privilege of grinding grain" was granted. The deed conveys the mill and water privileges *with* the monopoly. The word "together" is clearly implied; that is to say, "together with," etc. Another part of the description speaks of the mill and privileges *and* the monopoly; that is to say, one *and* the other, not one for the sole purpose of the other.

The judgment must be reversed, a new trial granted, costs to abide the event.

LEARNED, P. J., concurred; INGALLS, J., concurred except as stated in his opinion.

INGALLS, J. :

The referee has made the following finding, as the second conclusion of law, based upon the findings of fact : " Second. That the quantity of water to which said grist-mill lot is entitled, as found in the foregoing findings of fact, may be used for any and all hydraulic purposes." We are constrained to differ with the learned referee in regard to such finding of fact and the conclusion of law based thereon. The parties all derive their title from the same source, and their respective conveyances bear the same date, and were based upon purchase made at the same time. And the facts clearly indicate that the parties to said conveyances possessed, at the time they were executed, full knowledge of all the facts and circumstances in regard to the situation and condition of such water-power, and the manner it was then used, and of the purposes for which the purchases were made by the respective parties. The plaintiffs acquired by grant whatever right they possess to use such water, and such rights must be determined accordingly, and depend mainly upon the construction to be given to the deed which bears date July 8, 1829, executed by Abraham D. Brinckerhoff, Jonathan Griffin, Richard Kerse and Azariah C. Flagg, as trustees, etc., to Richard Yates, which deed is the plaintiff's source of title. Such deed, after describing the premises, contains the following provision : " Being the lot on which said grist-mill stands in said village, together with the exclusive right of, to and in the grist-mill ditch, as designated on said map, from said grist-mill up to the place of intersection with the canal, as marked on said map, with the privilege of taking water thereby, *for grinding,* from the mill-pond, for the use of said grist-mill forever, with the exclusive *privilege of grinding grain,* as purchased at the auction sale of the premises hereinafter mentioned ; the above premises being expressly conveyed, subject to and entitled to all the rights, privileges, conditions, provisions, reservations, restrictions and regulations contained in the *written terms of sale* of said premises, *and other mill privileges* and property, at auction on the fifth day of June last past, and other conditions *duly made known* at said sale, a copy of which is to this indenture annexed." Such written terms of sale contain the following : " Division of water. The grist-mill privilege to be first supplied with water sufficient *for grinding,* not exceeding a supply for eight run of stone,

the residue of the water in the river to be divided one-third to the west side and two-thirds to the east side of the river." The further provision found at folio 87 of case, as follows : " Grist-mill privilege. The exclusive right to the use of the ditch, now conveying water to it, to its intersection with the canal above mentioned. The width of the ditch to be as laid down on the map, and the exclusive *right of grinding*, by means of any water taken from the dam in the village of Plattsburgh." Regarding the provisions contained in the deed, and in the terms of sale, which was annexed thereto, and construing them in the light of the circumstances which were connected with such sale and conveyance, we are convinced that the grantee under such deed acquired only the right to *the use of water for grinding grain at said grist-mill*, and that the amount of water which he acquired the right to use *for such purpose only*, was by the terms of sale limited so as not to exceed sufficient for grinding not exceeding a supply for eight run of stone. So we perceive that two limitations were included in such grant, one in regard to the use to which the water could be devoted, viz. : *Grinding grain* at the grist-mill, and the other, the extreme limit as to the amount of water which the grantee should be at liberty to use *for such purpose only*.

It seems to us that the language employed in defining the grant admits of no other satisfactory interpretation, and that such rendering is consistent with what may fairly be inferred to have been the understanding and intention of the parties, as we infer from the terms of the grant, the situation of the premises, the extent of the water-power, the nature of the purchases made by the respective parties at such auction sale, and the relative rights which such purchasers acquired in the land and water-power by virtue of such sale, and the conveyances which followed the same. At the time such deed was executed the grist-mill, which was standing upon the premises now owned by the plaintiffs, was used as a country custom grist mill, and depended for support upon the kind of patronage which, at that period, came to such mills. The machinery by which such mill was propelled was crude, as compared with the machinery and appliances which are now in use for such purpose. Only four run of stone were employed in the mill. It is quite probable that the purchaser contemplated an increase of business at his mill, and,

therefore, secured the right to water sufficient to propel not to exceed eight run of stone. It will be perceived that such grantee acquired, by such purchase and conveyance, the *exclusive right to grind grain* at that place; and this prevented all competition in that business and secured a monopoly, the deed thus states, " with the privilege of taking water thereby, *for grinding*, from the mill-pond, for the *use of said grist-mill* forever, *with the exclusive privilege of grinding grain.*" The terms of sale, which were attached to the deed, contain these words: " The grist-mill privilege to be first supplied with water *sufficient for grinding*, and the exclusive right *of grinding* by means of any water taken from the dam of the village of Plattsburgh." In declaring the extreme limit to which the grantee might use the water for such purpose, this language is employed in the terms of sale: " Not exceeding a supply *for eight run of stone.*" Such expression seems consistent with that particular use, as such stones were required to grind grain at such grist-mill, whereas in other branches of business, to which the water could be applied to propel machinery, the stones would not be indispensable. The grinding of grain at such mill was the business transacted there at the time the deed was executed, and the facts and circumstances disclosed by the evidence indicate that it was the purpose of the grantee to continue such business, perhaps upon an enlarged scale, as he seems to have secured the right to increase the number of stones from four to eight, for the purpose of *grinding*. It is not, we think, unreasonable to infer that the *grantees* of the residue of the water-power, who purchased at the same time, and subject to *the exclusive right* of the grantee in the deed of the grist-mill property to carry on that business and to use water sufficient for that purpose within the limit above mentioned, purchased such residue water, with the expectation and intention that neither such grantee or his heirs or assigns, would be at liberty to change such use, and apply the power which he had thus secured to any other business, as the effect might be to enable such grantee or those who claimed under him, to wield such exclusive right to the water in such manner, as to create a competition with the other branches of business which the purchasers might establish, and thereby injure them. In regard to the grist-mill it would seem to be otherwise, as that was an established business, and the other

parties who purchased the residue power, could calculate its effect upon any other branch of business, and if the granting of such exclusive right was not based upon the assumption that the water was not to be employed in any business other than in grinding grain at such mill, we are at a loss to discover, from the facts disclosed, any reason or motive which could have induced the parties interested to consent to the granting of such an exclusive privilege to Richard Yates. It would, therefore, seem that all the parties who purchased at such sale of real estate, to which such right to use water was attached, so purchased under the expectation and understanding, that such exclusive right was to be confined *to such use only*. There seems little room for doubt, but that all the parties who purchased such real estate were fully informed in regard to the condition of the property, and of the motives and intentions. which influenced the parties, respectively, in making such purchases, and in endeavoring to secure their rights by virtue of such conveyances. It may be that such a change in business has occurred since the execution of the deeds, so long ago as 1829, that the plaintiffs find it for their interest to employ the water power which they possess, in other branches of business, but that should not be allowed to the prejudice of the rights of the defendants, if such contemplated change in the use of such water shall be found to violate the terms of the conveyance under which the plaintiffs hold their title and which defines their rights and privileges. In ascertaining such rights we must have regard to the state of things which existed in relation to the property and business at the period when the original deeds were executed in 1829. We have examined those conveyances with care, in the light of the surroundings, which attended their execution, and which accompanied the sale of the premises mentioned and described therein, so far as we have been able to ascertain the same from the evidence contained in the printed case, and have endeavored to give to such conveyances a reasonable ·interpretation, having due regard to the terms thereof, and at the same time giving proper force and effect to what seems to have been the intention of the parties as gathered from such conveyances, and the surroundings of the transaction which are proper to be considered in determining such question. It is apparent from the adjudications upon this subject that courts are inclined to construe grants of

water for hydraulic purposes liberally in favor of the grantee, so far as regards the right of such grantee to devote such water to any lawful purpose, provided such use of the water does not exceed the limit prescribed as to quantity; yet exceptions to such general rule are recognized and enforced when it is made to appear from the conveyance under which such right is claimed, construed in view of the circumstances attending the same, that the parties intended to restrict the use of the water to a particular business or purpose. We conclude that the facts and circumstances disclosed in this case fairly bring it within the above exception, and in so holding we think a proper construction will be given to the deed under which the plaintiffs hold their title, and the intention of the parties thereto will be carried into effect; and the rights and interests of the parties to the action will be protected. We refer to the following adjudications as supporting the views herein expressed in regard to the nature and legal effect of the said grant: *Ashley* v. *Pease* (18 Pick., 268); *Strong* v. *Benedict* (5 Conn., 210). These cases, we think, bear with great force upon the case at bar, and support the contention advanced by the counsel for the appellants herein in regard to the nature and extent of such grant. In their main features the cases referred to bear a strong resemblance to those of the case under consideration. In the opinions pronounced in the cases referred to it will be observed that there is considerable discussion in regard to the motives and intentions of the parties in entering into such agreement, and in regard to the situation of the property to be affected by such grants; and we are impressed by the resemblance in some material respects between the facts of those cases, and the one at bar, as bearing upon the merits herein. The cases referred to are commented upon by Judge HARRIS in *Cromwell* v. *Selden* (3 N. Y., 253), which is cited by the counsel for the respondents herein, and is a case frequently to be met with in examining this subject. In that case the cases referred to are not overruled, but are distinguished upon *the facts* from the one then under consideration by Judge HARRIS speaking for the Court of Appeals. We are persuaded that the facts of the case at bar present a more marked distinction to *Cromwell* v. *Selden* (*supra*), and much more clearly indicate an intention to grant the water only for a special and restricted use, viz., *grinding grain* at the grist-mill upon

the premises, than are to be found in the facts contained in *Ashley* v. *Pease* and *Strong* v. *Benedict* referred to. We refer also to *Borst* v. *Empire* (5 N. Y., 34). The reasoning of the opinion in that case, we think, sustains the appellant's theory herein when applied to the facts of this case.

The learned judge says, in his opinion: "For instance, if instead of leaving the words 'for the purpose of supplying the tannery aforesaid with water,' at the end of the clause where they merely define the object of the 'well' and the 'water-works,' we could advance them so as to form a connection with the word '*use*.' We might then say the water had then been reserved for a *special and particular purpose*." By transposing the words as suggested in the opinion, the reservation contained in the deed in that case would read as follows: And the said parties of the first part, as aforesaid, do also reserve to themselves, and *their use* for the purpose of supplying this tannery with water, a certain well and water-works laid down. Upon referring again to the covenant in the deed to Richard Yates, under which the plaintiffs claim to derive their title and the right to use the water in question, we find that it reads as follows: With the privilege of taking the water thereby *for grinding* from the mill-pond for the use of said grist-mill forever, with the exclusive privilege of *grinding grain*. It seems, therefore, that the case last cited may be fairly regarded as supporting the contention of the appellants herein; we do not discover that either of the cases above cited has been rejected as authority by any court or writer of an elementary treatise upon this subject which has come under our notice. The terms of sale contained the limitation in regard to the extreme amount of water which the grantee in the deed would be entitled to use for the purpose specified in the deed, and hence, it would seem that the parties intended that such deed, independent of the terms of sale, should declare the use to which the water was to be devoted; and that the terms of sale was to define the extreme limit in regard to the amount of water to be used by the grantee for the purpose specified in the deed. It is true that the terms of sale were annexed to the deed, and therein referred to as a part thereof. to accomplish a certain purpose as above stated; and the provisions contained in such terms of sale seem to be in entire harmony with the deed in regard to the

use to which the water was to be devoted. Such terms of sale contain the following: "The grist-mill privilege to be first supplied with water sufficient *for grinding.* * * * And the exclusive right of grinding by means of any water taken from the dam in the village of Plattsburgh." Grinding what? Such inquiry is fairly answered by reference to the following clause in the deed: "With the exclusive privilege of *grinding grain.*" And which was the use to which the water was applied at the time of the grant; and as the facts and circumstances seem fairly to imply that such was the use to which the water was to be devoted according to the intention of the parties interested therein.

We have examined the cases cited by the counsel for the respondent, and, without attempting to discuss each case, we have become satisfied by such examination that they cannot be regarded as controlling in this case, for the reason that the facts upon which such decisions were made, differ materially from the facts of the case we are considering. Each case must be determined according to the facts which belong to it, and the intention of the parties, as disclosed by such facts, constitutes an essential element in such determination by which a deed is to be construed, and the rights of the parties interested therein are to be settled. While the cases cited by the counsel for the respondents contain doctrine upon this subject which has a general bearing upon this class of cases, yet it can only be determined whether they are to be accepted as controlling in this case, by carefully examining the facts contained in the cases cited and the facts of this case and comparing the same; this work we have endeavored faithfully to perform, and have, as the result of such investigation, reached the conclusion that, by the terms of the deed executed by Abraham D. Brinkerhoff and others to Richard Yates, bearing date July 8, 1829, and under which the plaintiffs claim their title, that the grantee in such deed acquired only the right to use such water for the purpose of grinding grain at his grist-mill upon said premises. And that he was limited in regard to the amount of water which he was entitled to use for such purpose only to what was sufficient to propel eight run of stone. As the plaintiffs derive their title from such conveyance, they are bound by its terms, and are consequently restricted in the use of the water accordingly. Having reached such result, it seems neither necessary

or profitable to consider the other questions discussed so ably by the respective counsel upon the argument of this case, as the conclusion reached necessitates another trial of the action.

The judgment must, therefore, be reversed, and a new trial ordered at the circuit, with costs to abide the event of the action.

Judgment reversed, new trial granted, referee discharged, costs to abide event.