Adams et al. *v.* Warner et al.

ABRAHAM ADAMS AND OTHERS *v.* JOEL WARNER AND OTHERS.

*Grant of water power. Whether limitation of use or quantity. Reservation of water power. Forfeiture of grant. When extent of grant defined by use. Exception repugnant to grant. Declarations of persons in the chain of title.*

A grant of a water privilege will not ordinarily be restricted to the particular use named in the grant, unless the terms of the deed seem very clearly to indicate scuh an intention, and the use has been uniformly consistent with such a construction; but the use is to be regarded as a measure of the quantity to be used.

And reservations of water for a specified use are as much to be considered a measure of quantity, as grants.

In 1824 the defendants' grantors, who were the owners of mills and water power, conveyed to the plaintiffs' grantors the privilege of erecting a suitable building for the use of carding wool and dressing cloth, to be located below the grist mill which the grantors were about to erect upon the stream, and the privilege of connecting a flume with the flume of the grist mill, and of drawing water at all times from the flume of the grist mill, "excepting such quantity of water as ' is necessary for the use of two runs of stones in the grain or grist mill, and 'that, in case there is not water in the flume for the use of both carding ma- ' chines and clothing works and the grist mill, that the grain or grist mill ' shall at all times have water sufficient for grinding with two runs of stones, in ' preference to the carding machines and clothing works.'' In 1825 the grantors in that deed erected their grist mill, with three runs of stones, a corn cracker and smut mill, which were propelled by four water wheels; and the same season the grantees in that deed erected their clothing works below the grist mill, and a flume, to conduct water for the use of the machinery therein, was connected with the flume of the grist mill. In 1830 the defendants' grantors placed another run of stones in the grist mill, and erected a machine shop adjoining

Adams et al. *v.* Warner et al.

the grist mill, and attached the corn cracker and smut mill to the wheel of the machine shop. In 1831 the defendants' grantors conveyed to the plaintiffs' grantors an additional privilege, which was described as follows;—" the farther ' right and privilege of drawing water from [the] grist mill flume and pond at ' all times, for the purpose of manufacturing any and every kind and descrip- ' tion of woolen, or cotton, or linen, or hemp, or silk goods, or manufactures; ' provided, if the said [grantees] shall draw more water from said flume and ' pond, than they now have a right to draw, they shall not draw such additional ' quantity of water from said flume and pond, so as to interfere with the privi- ' leges now belonging and reserved to the said grist mill, nor so as to interfere ' with the privileges belonging to the saw mill owned by David Stimson." And it was held, that the reservation for the grist mill, in the first deed, defined the use of water for two runs of stones as a measure of the quantity of water to be used, and not as a restriction to that particular use; and that this was the reservation of privileges for the grist mill which was referred to in the second deed; but that this reservation was to be understood as of the date of the second deed, and that it reserved to the grantors the right to use the quantity of water named a sufficient portion of the time to do all the business then done in the grist mill, or which might reasonably be then expected to be done, without essential addition to the machinery,—in no event exceeding an amount of water power that would be given by the constant use of water sufficient to carry two runs of stones.

In 1830 the defendants' grantors had also conveyed to one S. the saw mill upon the same dam, with the privileges belonging to it, but subject to the right of the plaintiffs' grantors, under the deed executed in 1824, to use water for their clothing works, and also reserving to the grantors in that deed the first privilege of drawing water for the use of the grist mill. In 1833, subsequent to the grant of the additional manufacturing privilege above mentioned, S. reconveyed to his grantors, by quitclaim deed, the premises and privileges conveyed to him in 1830, and the same grantors, upon the same day, executed to him another deed, conveying the saw mill, with the privilege of drawing water from the pond for its use, when there should be more water in the pond, than was wanted for the use of the grist mill and to carry all the machinery therein, as then used, and also making it subject to the clothing works of the plaintiffs' grantors, or any other machinery, that should draw no more water than had been formerly used for the clothing works, and also imposing certain other restrictions upon its use, and providing, that S. might draw " water for the use of ' the saw mill and shingle machinery in manner aforesaid, and no more, nor in ' any other way, nor for any other purpose whatever." The title acquired by S. under this deed subsequently became vested in the plaintiffs' grantors, and the saw mill was removed, and the site remained vacant. And it was held, that the first and second grants to S. were of a *quantity* of water, sufficient to carry the saw mill, and that, the title to it having come to the plaintiffs, they might use that quantity of water to increase their manufacturing privilege, provided they did not encroach upon the rights reserved to the defendants.

Adams et al. *v.* Warner et al.

And it was also held, that although the plaintiffs' grantors, immediately after the execution of the deed of the additional manufacturing privilege in 1831, enlarged the building which they then occupied, and placed in it one set of machinery for manufacturing cassimeres, and continued so to use their privilege until 1836, this was not any such election, or acquiesence in a particular use of the water, as would restrict them, in the exercise of their rights, below the fair construction of their deed. To have this effect, the grant should have been so far general, as to be wholly undefined on the face of the grant,—thus evidently looking to the use, as the grantee's own construction of his grant.

An exception, in a deed, is not held void, merely because, to some extent, it is inconsistent with the grant. Where any such rule of construction has been adopted, it has been as matter of strict necessity, for the reason, that, by giving effect to the exception, the grant would become wholly inoperative.

Where the terms of a deed are equivocal, resort may be had to evidence of the declarations and claim of right of the party, under the deed, and those from whom he claims title; and where the terms of the deed are not equivocal, and the court give to it the proper construction, it is not ground of error, that such evidence was received, when it appears, that no ·use was made of it, unless as a guide to the court.

TRESPASS ON THE CASE for diverting water from the plaintiffs' woolen factory on Black River, in Ludlow, from April 14, 1845, to March 6, 1847. Plea, the general issue, and trial by jury, May Term, 1849,—KELLOGG, J., presiding.

On trial the plaintiffs gave in evidence a lease from Ezekiel Wright to Edmund Durrin, dated October 11, 1806, by which there was conveyed to the lessee and his assigns forever, subject to a rent reserved, the right to build and occupy a fulling mill and other necessaries for the use of dressing cloth,—the mill to be erected between where the grantor's grist mill then stood, which was upon the north side of the stream, and where the main stream then run, and water to be taken from the grantor's pond, sufficient to carry the fulling mills and machines for the use of dressing cloth. And the grantor covenanted, that he, or his assigns, would not saw, or draw water for the saw mill, when it was required for the use of dressing cloth; and the lessee covenanted, that he, or his assigns, would not draw water for fulling, when the grain mill might require the whole, that run in the stream, and would not put any more machines to take water than three, to wit, fulling mills, shearing machines and napping machines. Also a deed from Edmund Durrin to Joseph

Patterson, dated May 28, 1807, conveying the privileges granted to him by this lease. Also a deed from Ezekiel Wright to Joseph Patterson and Nathan P. Fletcher, dated November 23, 1808, conveying a parcel of land, fifty feet by twenty feet, adjoining the grist mill, and south of it, being part of an island in the stream, with the fulling mill building and appurtenances standing thereon, with the exclusive privilege of erecting a fulling mill and carding machine thereon, at the discretion of the grantees, " with the privilege of drawing water, at all times, from the pond, for the only use of such machines, as aforesaid, excepting such quantity of water, as may be necessary for the grist mill now erected, in case there is not sufficient water in said pond for the use of both," and providing, that, in case of failure, the grist mill should have " such a quantity of water, as is necessary for use thereof, in preference to the machines aforesaid ;" and conveying " the exclusive right of manufacturing rolls, wool, carding rolls, picking, fulling, pressing, shearing, dressing cloth, usual or customary in machines of the kind, or [that] may by experience be found necessary for their use." By this deed an additional yearly rent was reserved to the grantor. Also, a deed, from Nathan P. Fletcher to Joseph Patterson, dated April 25, 1809, conveying all the interest conveyed to Fletcher by the last mentioned deed. Also, several deeds, the last of which was dated August 26, 1822, conveying to Joseph Patterson a parcel of land, lying upon the south side of the river, and extending to the centre of the river, and six rods southerly from the south bank of the river, and twelve rods upon the stream. Also, a deed from Ezekiel Wright to W. & D. W. Hall, dated July 27, 1811, conveying all the land owned by Wright, situated upon the north side of the stream, and extending to the south bank thereof, with all the mills, &c., thereon standing, and the water power, subject to the right of Joseph Patterson, together with the right to receive the rents above mentioned. Also, deeds showing, that, May 27, 1824, Stephen Cummings and Lyman Burnham were tenants in common of all the land and privileges conveyed by Wright to W. & D. W. Hall, as above mentioned,—except the rent, which was subsequently extinguished,—and also of the land upon the south side of the stream, of which Patterson had become the owner, August 26, 1822, as above stated. Also, a deed from Patterson to Pliny Parker and Benjamin Billings, dated October 30, 1824, conveying the

premises, and privileges for clothing works and carding machines, conveyed to Patterson and Fletcher by Wright, as above stated. Also a deed from Cummings and Burnham to Parker & Billings, dated October 30, 1824, conveying to the grantees, by metes and bounds, the parcel of land south of the centre of the river, of which Patterson became the owner August 26, 1822, as above stated; and this deed then proceeded as follows;—"Meaning to convey to the said Pliny 'and Benjamin the privilege of erecting a suitable building for the 'use of carding wool and dressing cloth, which building shall be 'placed so far east of the dam, as to leave sufficient room for a grist 'mill to be placed between it and the dam; also the privilege of 'connecting a flume with the flume of a grist mill, which the said 'Cummings and Burnham are about to erect, and of drawing water 'at all times from the flume of said grist mill, which shall hereafter 'be erected, excepting such quantity of water as is necessary for the 'use of two runs of stones in the grain or grist mill; and that, in 'case there is not water in the flume for the use of both carding 'machines and clothing works and the grist mill, that the grain 'or grist mill shall, at all times, have water sufficient for grinding 'with two runs of stones, in preference to the carding machines 'and clothing works; also the said Pliny and Benjamin shall have 'privilege of egress and regress to and from the above described 'land, with the privilege of erecting a wood shed thirty feet in length 'and fourteen feet in width, on the south line of the above described 'premises, which shed shall stand sixty feet west of the east line of 'said land;—the said Stephen Cummings and Lyman Burnham re- 'serving to themselves, their heirs and assigns forever, all the re- 'maining right, title, interest, privileges and appurtenances of the 'above described premises,—not meaning to debar said Cummings 'and Burnham from the privilege of conveying the water, from the 'flume of said machines and clothiers' works, east of said works, for 'the use of any other machinery or water works, which the said 'Cummings and Burnham may choose to erect;—meaning to grant 'the said Parker & Billings the exclusive right of carding wool and 'dressing cloth on the south side of Black River." *Habendum* in usual form.

The plaintiffs also gave in evidence several deeds, the last of which was dated May 19, 1830, by which Lyman Burnham became

the sole owner of the premises and privileges before owned by Cummings and Burnham;—and also a deed from Parker & Billings to Streeter & Fuller, dated January 15, 1831, conveying all the premises and privileges for clothing works, &c., then owned by the grantors, and above mentioned.

The plaintiffs proved, that a saw mill and a grist mill with two runs of stones were erected on the north side of Black River as early as 1808, and were both under the same roof. This mill never had but two runs of stones. A carding and clothiers' shop were soon after erected south of and near said mill, on a small island, (described in the deed from Wright to Patterson and Fletcher, above mentioned,) and were used by Patterson and others for carding wool and dressing cloth until the autumn of 1825, when Parker & Billings erected a building, (called the "small factory") on the south side of the river, under their deed from Cummings & Burnham, above mentioned, and removed their machinery from the building upon the island to their building on the south side of the river. In 1826 the island and the building upon it were washed away by the water, and the site has ever since remained vacant. Parker & Billings used the "small factory," on the south side of the river, as a custom shop for wool carding and cloth dressing, until January 15, 1831, when they sold to Streeter & Fuller, as above mentioned.

Burnham and Emery Burpee, who had then purchased the interest of Cummings in the premises, erected the grist mill upon the south side of the river in 1825, and placed in it three runs of stones, a corn cracker and smut mill, which were propelled by four water wheels. The "small factory," erected by Parker & Billings, adjoined this grist mill upon the east, and a flume was connected with the flume of the grist mill, from which water was taken for the use of the machinery in the "small factory," as long as any machinery was used therein. In 1830 Burnham put another run of stones into the grist mill, and built a machine shop west of and adjoining it, and attached the corn cracker and smut mill to the wheel of the machine shop.

The plaintiffs also gave in evidence a warrantee deed from Lyman Burnham to Streeter & Fuller, dated March 23, 1831, which conveyed to the grantees, as follows,—"In addition to the rights and 'privileges which they now own, the farther right and privilege of

' drawing water from my grist mill flume and pond, in said Ludlow,
' at all times, for the purpose of manufacturing any and every kind
' and description of woolen, or cotton, or linen, or hemp, or silk
' goods, or manufactures; provided, if the said Streeter & Fuller
' shall draw more water from said flume and pond, than they now
' have a right to draw, they shall not draw such additional quantity
' of water from said flume and pond, so as to interfere with the priv-
' ileges now belonging and reserved to the said grist mill, nor so as
' to interfere with the privileges belonging to the saw mill owned by
' David Stimson." Also, a deed from Streeter & Fuller to John B.
Bigelow, dated March 24, 1831, conveying one undivided third part
of the premises and privileges then owned by Streeter & Fuller.
Also, a deed from Lyman Burnham to Streeter, Fuller & Bigelow,
dated July 19, 1832, conveying, in fee, a parcel of land, situate east
of and adjoining the grist mill, extending easterly to the south line
of the parcel of land of which Joseph Patterson became the owner,
August 26, 1822, as above stated, and extending northerly to the
centre of the river, and southerly to a line fifteen feet south of the
front of the "small factory," then owned by the grantees; and also
conveying, for the purpose of being used in repairing or rebuilding
the factory, or to be inclosed for a yard, another parcel of land, ten
feet wide, and south of and adjoining the first described piece; and
reserving to the grantor and his heirs the right of passing and re-
passing over said premises, for the purpose of repairing or rebuild-
ing his mill dam, or grist mill. Also, several deeds, the last of
which was dated May 23, 1838, by which the title to the premises
and privileges owned by Streeter, Fuller & Bigelow, as above de-
scribed, passed, through Streeter & Fuller, Streeter & Stowell,
Stephen Cummings, The Green Mountain Woolen Manufacturing
Company, Henry Hodges, Whitwell, Bond & Co., and William
Warner to William Sturgis.

The plaintiffs also gave in evidence a deed from Lyman Burnham
to David Stimson, Jr., dated December 3, 1830, conveying a parcel
of land, described by metes and bounds, which lay north of the cen-
tre of the river, described as "meaning to convey the saw mill and
all the privileges belonging to the same included within the above
bounds, except a claim of Parker & Billings near the centre of the
dam;"—and to this deed there was this clause,—"It being expressly

XXIII.      51

' understood, that Parker & Billings, their heirs and assigns, shall
' have the privilege of drawing water for the carding machine, cloth-
' ing works, and any other machinery not requiring or taking more
' water than they now draw, and that the said Burnham, his heirs
' and assigns, shall at all times have the first privilege of drawing
' water for the use of the grist mill." Also, a deed from Stimson to
Burnham, dated January 8, 1833, reconveying the same premises,
except a small part of the northerly portion of the land, which had
been previously sold by Stimson. Also, a deed from Burnham to
Stimson, of the same date, reconveying the same premises described
in the last named deed, with this additional description:—" To-
' gether with the saw mill on said premises, and the privilege at all
' times forever of drawing water for the use of or to carry said saw
' mill, when there shall be more water in the said mill pond, than
' shall be wanted for the use of the grist mill, and to carry all the
' machinery therein in the same manner that is now used for the use
' of said grist mill, and also more than sufficient to carry the cloth-
' ing machinery and carding machinery of Streeter, Fuller & Bige-
' low, or any other machinery, that shall not draw more water than
' Parker & Billings formerly used for the use of carding wool and
' dressing cloth at the shop now occupied by said Streeter, Fuller
' & Bigelow ; and also the privilege of drawing water sufficient to
' carry two shingle machines, after all the aforesaid machinery and
' saw mill are supplied ;—the said Burnham always reserving and
' excepting, in the aforesaid grant, to himself, the equal privilege
' with said Stimson's privilege of drawing water for the use of said
' shingle machines, the right of drawing water for his new shop,
' now standing between the aforesaid bridge and grist mill," (which
' was the machine shop, above mentioned,) " and the privilege of
' passing and repassing through the saw mill yard, to a piece of land
' east of said saw mill, which is now owned by said Burnham, and
' the privilege of taking water from the flume, or dam, near said saw
' mill, and carrying it through or by the side of said saw mill to said
' piece of land east of said saw mill, in such manner as not to injure
' the machinery of the said saw mill, or shingle mills, which the said
' Stimson may hereafter put into said saw mill ;—and also excepting
' a claim of Streeter, Fuller & Bigelow near the centre of the river
' aforesaid. The said Stimson, his heirs and assigns, forever to

' build and keep in repair one half of the dam for the use of said
' mill, wanting five feet. It is expressly understood, that the said
' Stimson may draw water for the use of the saw mill and shingle
' machinery in manner aforesaid, and no more, nor in any other
' way, nor for any other purpose whatever."

The plaintiffs also gave in evidence several deeds, the last of which was dated September 3, 1838, by which the title to the premises and privileges conveyed to Stimson by the deed of January 8, 1833, passed to William Sturgis, above named. Also several deeds, the last of which was dated April 12, 1845, by which all of the title of William Sturgis to the premises and privileges belonging to him by both series of conveyances, as above described, passed to and vested in the plaintiffs. Also several deeds, the last of which was dated January 4, 1841, by which the title of Lyman Burnham, as above described, vested in the defendants.

In the spring after Streeter & Fuller purchased the "small factory," and after the deeds of March 23, and March 24, 1831, were executed, Streeter, Fuller & Bigelow put an additional story thereon, and put in one set of machinery for manufacturing cassimeres, which was used for manufacturing until the early part of the year 1836, when the machinery was taken therefrom and put into a new building, called the Brick Factory, then recently erected. The "small factory" was not used after that, and was subsequently taken down, and the site is vacant. In 1835 the Brick Factory was erected by the Green Mountain Woolen Manufacturing Company, and was situate next east of the "small factory," and three sets of machinery for manufacturing cassimeres were put into it; and it was used from the fore part of the year 1836 until sometime in 1838, as a factory, when the owners failed and it was not again used until the spring of 1844, since which time it has been used by the plaintiffs and their grantors. When the Brick Factory was erected, water was conveyed to it from the pond by a penstock, and another penstock was put into the grist mill flume in 1845, through both of which the water is conveyed to the factory building. The plaintiffs gave evidence tending to prove, that the water used in the carding machine and clothing works was sufficient to carry one set of machinery in the Brick Factory.

In 1845 the machine shop was rebuilt and enlarged, and the corn

cracker and smut mill were attached to one of the grist mill water wheels, and a new wheel was put in for the machine shop. After the sale of the saw mill to Sturgis, it was torn down, which was previous to April, 1845, and the site remains vacant. The plaintiffs also gave evidence tending to prove, that the defendants, during the time mentioned in the plaintiffs' declaration, kept their gates and flumes in a leaky condition, and at divers times, during that time, when there was a scarcity of water, drew water for more than two runs of stones for the grist mill, and for the machine shop, and thereby diverted the water from the plaintiffs' factory, and hindered and prevented their running the machinery of said factory, to the prejudice and injury of the plaintiffs.

The plaintiffs offered to prove, that Burnham, after his deed to Streeter & Fuller of March 23, 1831, and after Streeter, Fuller & Bigelow commenced manufacturing, claimed and exercised, during the time he continued to own the grist mill, a privilege of water for only two runs of stones for his grist mill paramount to Streeter, Fuller & Bigelow's privilege of water for manufacturing,—and also offered evidence tending to prove, that the defendants, during the time mentioned in the plaintiffs' declaration, said that they had no privilege of water for the machine shop, except when the water run over the dam, and behind all the other privileges; which evidence was objected to by the defendants, but was admitted by the court. The plaintiffs also offered to prove what the defendants and their grantors, while in possession and owners, had said about their right of drawing water for the use of the grist mill and machine shop, reserved in their deed ; to which the defendants objected, but it was admitted by the court.

The defendants gave in evidence a deed from the defendants to Emory Burpee, dated January 3, 1842, conveying the land next east of the saw mill premises, and the right of conveying water thereto, reserved in the deed from Burnham to Stimson, dated July 8, 1833, above mentioned, but reserving the right to draw water for the machine shop paramount to the right conveyed to Burpee. The defendants also gave evidence tending to prove, that during the year 1845, and ever since, the saw mill deeded to Stimson had been down and disused, and that, when there was not sufficient water for both the plaintiffs' and the defendants' use, they had not drawn more

Adams et al. *v.* Warner et al.

water, than was sufficient to carry three runs of stones in the grist mill, nor more than was sufficient to carry two runs of stones in the grist mill and Stimson's saw mill.

The defendants requested the court to charge the jury,—1. That if the plaintiffs drew water for the brick factory in a different manner and at a different place from that which Streeter & Fuller drew it for manufacturing in the small factory, they could not recover. 2. That if the jury found, that the defendants had not, during the time complained of, drawn more water than was sufficient to carry three runs of stones in the grist mill, or more than sufficient to carry two runs of stones in the grist mill and Stimson's saw mill, the plaintiffs could not recover.

But the court charged the jury, that the plaintiffs had a right to draw water in a different place, and in a different manner, from that selected by Streeter & Fuller; and if the defendants had drawn more water, than was sufficient to carry two runs of stones in the grist mill, and the plaintiffs were injured thereby, they were entitled to recover the damages thus sustained.

The plaintiffs requested the court to charge the jury, that the defendants had no right to appropriate the water, reserved for the use of two runs of stones for their grist mill, to any other purpose, than for the use of said grist mill. But the court instructed the jury, that the water reserved for two runs of stones for the grist mill defined and limited the quantity of water, that was reserved, and not the use, and that the defendants had a right to use it for any purpose they chose, provided they did not use any more water, than was sufficient for the use of two runs of stones for the grist mill.

Verdict for plaintiffs. Exceptions by both parties.

*S. Fullam* for defendants.

The defendants insist, that the court erred in refusing to charge as requested in the first request. The plaintiffs' only right of drawing water is derived from two deeds, Cummings & Burnham to Parker & Billings, and Lyman Burnham to Streeter & Fuller. By the latter deed, the privilege of drawing water was enlarged; the deeds conveyed but a limited privilege; and when an *election* of the manner of using the water was once made, they were bound by that *election*. So in relation to the amount; when the plaintiffs' grantors

had elected a certain amount, and for several years had drawn that amount, they were not at liberty to increase it. We place this question upon the same ground, that we should an undefined right of way, and insist, that when an *election* and appropriation is made, the rights of all parties are fixed, especially after a uniform use for a number of years.

The defendants also insist, that the court erred in refusing to charge as requested in the second request. If the plaintiffs were not bound by their election, then the rights of the several parties to draw water were as follows;—1. The defendants had a right of drawing water sufficient to carry two runs of stones. See deed, Cummings & Burnham to Parker & Billings. 2. The plaintiffs had a right to draw water to the extent Parker & Billings drew it for carding wool and dressing cloth. See same deed. 3. The defendants had the right to draw water for the residue of the grist mill. See the two deeds, L. Burnham to D. Stimson, Jr., and the deed, D. Stimson, Jr., to L. Burnham. 4. The right of drawing water for the use of the saw mill, which, after the *non user*, vested in the defendants. See Burnham's two deeds to Stimson, Stimson's deed to Burnham, and the defendants' deeds. 5. The additional water for the use of the factory. See Burnham's deed to Streeter & Fuller. 6. The machine shop and two shingle mills. See Burnham's deed to Stimson, of January 8, 1833. 7. Emory Burpee's right to draw for the use of carrying a single wheel. See deed to Burpee, above cited. 8. The defendants owned the residue.

The exceptions find, that three runs of stones were put in the grist mill in 1825, and an additional one in 1830, all of which was before the deed of the "additional privilege," (May 23, 1831.) See deed, Burnham to Streeter & Fuller. And by Burnham's deed to Stimson, (Dec. 3, 1830,) he reserved the right deeded to Parker & Billings, (for wool carding and cloth dressing,) and "the first privilege of drawing water for the use of the grist mill." The plaintiffs' privilege of drawing the "additional water" was postponed to the saw mill and grist mill. By Burnham's second deed to Stimson the manner and purpose of drawing water were defined and restricted. Burnham having succeeded to Stimson's original right under his first deed, when the right of drawing under Stimson's last deed was vacated by *non user*, the whole original saw mill right vested in

Burnham and his agents.  If it did not, yet the plaintiffs could not use the water for carrying the factory,—its use being restricted to the saw mill.

The defendants farther insist, that the court erred in admitting testimony proving Burnham's admissions.  The rights of all the parties *then* and *now* are clearly defined by recorded deeds, and by them alone can the parties have their rights tried.

The court were manifestly right in their instructions to the jury, set forth in the plaintiffs' exceptions.  1.  Because at the time of the execution of the deed from Cummings & Burnham to Parker & Billings, Oct. 30, 1824, Cummings & Burnham were the sole owners of the entire water privilege in fee, and had a right of using the water in any lawful manner which they might choose.  When, therefore, they reserved water *sufficient* to carry two runs of stones in the grist mill, before Parker & Billings' right of drawing water could be exercised, they reserved that quantity, but did not deprive themselves of the right of using it as they pleased.  2.  This construction is more beneficial to the defendants, without being more injurious to the plaintiffs.  3.  Public policy demands an unrestrained application of the power in a manner most profitable to the owner, and consequently most beneficial to community.  *Crowell* v. *Seldon*, 3 Comst. 253.  *Ashley* v. *Pease*, 18 Pick. 268.  *Bigelow* v. *Battel*, 15 Mass. 313.  *Johnson* v. *Rand*, 2 N. H. 22.  *Bullen* v. *Runnels*, 2 N. H. 255.  *Luttrell's Case*, 4 Coke 86.

*Washburn & Marsh, R. Washburn* and *E. Hutchinson* for plaintiffs.

The plaintiffs claim, that they are entitled to use all the water, except sufficient for the use of two runs of stones in the grist mill; and this title is derived from two sources,—1.  The *clothing privilege*, derived from Ezekiel Wright,—2.  The *additional manufacturing privilege*, derived from Lyman Burnham.  The clothing privilege is defined by the lease from Wright to Durrin, in 1806, the deed from Wright to Patterson and Fletcher, in 1808, the deed from Cummings & Burnham to Parker & Billings, in 1824, and the deed from Burnham to Stimson, in 1830.  The manufacturing privilege is defined in the deed from Burnham to Streeter & Fuller, in 1831.  It was provided in this deed, that the grantees should not

draw water, so as to interfere with the privileges then belonging and reserved to the grist mill. · This being an *addition* to the clothing privilege, without defining it, reference must be had to the previous deeds for the purpose of defining it; and the grist mill privilege is left to be defined in the same manner. This must be by deeds in the chain of title of the grantor and grantee, and can have no reference to collateral conveyances. By the lease from Wright to Durrin and the deed from Wright to Patterson & Fletcher, water was reserved for the entire grist mill. But in construing deeds we may have reference to the circumstances existing at the time; *Strong* v. *Benedict*, 5 Conn. 220; and it being proved, that two runs of stones then constituted the entire grist mill, that must be taken to be the extent of the grist mill privilege; and in the deed from Cummings & Burnham to Parker & Billings it is expressly so defined. It was also provided, that the grantees should not interfere with the privileges belonging to the saw mill. The plaintiffs are owners of the saw mill, and having permanently suspended its use, they have removed all liability to interference, and hence have the permanent right to use the water, as they would have done during the intervals of using the saw mill, if it were standing.

But the privilege granted by the deed of 1831, being an *addition* to the privilege before enjoyed, and changing the *use*, created an indivisible privilege to use water for all purposes of manufacturing, subject only to the paramount right for two runs of stones in the grist mill. This privilege could only be postponed to the saw mill privilege by entirely surrendering the priority always enjoyed by the clothing privilege; and it will not be presumed, that the owners of the clothing privilege, by purchasing an *addition* to that privilege, intended thereby to destroy or diminish it. *Winter* v. *Loveden*, Ld. Raym. 267. *Cardigan* v. *Armitage*, 9 E. C. L. 64.

The defendants have no rights upon either side of the stream, unless, possibly, for water sufficient to carry two runs of stones. By the deed from Cummings & Burnham to Parker & Billings, the grantors conveyed, by the former part of the premises of the deed, the entire land, *in fee*, which they then owned upon the south side of the stream, describing it by metes and bounds, and then attempted to *limit* the grant, by defining the use to which it might be put by the grantees, and reserved all the remaining title and interest in the

premises.   This was an *exception* of a part of the same premises before specifically granted, and was therefore void for repugnancy. *Douglass* v. *Lock*, 4 Nev. & M. 807, [30 E. C. L. 416.]   *Shirley* v. *Wood*, Hob. 72.   *Stukeley* v. *Butler*, Hob. 170.   Com. Dig., *Fait* E, 7.   Vin., Grants H, 13, *pl.* 25, 53, n.; H, a, 10, *pl.* 1, 4. *Cardigan* v. *Armitage*, 2 B. & C. 197, [9 E. C. L. 60.]   *Worthington* v. *Hyler*, 4 Mass. 205.   *Cutler* v. *Tufts*, 3 Pick. 277.   4 Kent 468.   *Isham* v. *Morgan*, 9 Conn. 374.   *Beach* v. *Haynes*, 12 Vt. 15.

The doctrine claimed by the defendants, that Parker & Billings having *located* their building at a particular point upon the south side of the stream, the water can be used at no other point, could only apply, in case the water had been used at that point for fifteen years.   But if the deed of 1824 would have the effect to locate the right, the subsequent deed of 1832, from Burnham to Streeter, Fuller & Bigelow, conveying the fee in all the land covered by that building and by the present factory, would enlarge that right.

The evidence of the declarations of Burnham, after he had conveyed the additional manufacturing privilege to Streeter & Fuller, as to the extent of the right he had reserved and was then exercising, was properly admitted.   1 Greenl. Ev. 134, § 109.   *Jackson* v. *Bard*, 4 Johns. 230.   *Beecher* v. *Parmelee*, 9 Vt. 352.   *Woolway* v. *Rowe*, 1 Ad. & E. 114, [28 E. C. L. 52.]   *Hewlett* v. *Cook*, 7 Wend. 376.

The paramount right of the defendants is restricted to the use of water for two runs of stones for a *grist mill*, and for no other purpose.   Where the grant is of a water power, and the privilege itself is the principal subject, it is essential, that the terms of the grant should be general, or at least equivocal, leaving it in doubt, whether particular machinery is named as a measure of the quantity of water, or as a restriction upon its *use*, in order to justify courts in giving to it the former construction ; and then they give it such construction upon the principle, that the equivocal words are to be taken most strongly against the grantor; but the same principle must apply in the case of a *reservation*, instead of a grant, with this difference, that then, in case of doubt, the words, being to be taken most strongly against the grantor, must be construed to restrict the use, and not merely the quantity.   Shep. Touch. 100.   *Cardigan* v.

*Armitage,* 9 E. C. L. 63.　　But the terms, in which the reservation is made, are not equivocal, but distinctly limit the privilege reserved to water for the use of two runs of stones. *Strong* v. *Benedict,* 5 Conn. 210.　*Ashley* v. *Pease,* 18 Pick. 268.　And this latitude of construction is never allowed, when the machinery named would render entirely uncertain the measure of water to be used, in case the grant should be so construed; 18 Pick. 277; nor when the change of the machinery would operate to the prejudice of the other party. *Luttrell's Case,* 4 Co. 87. *Rogers et al.* v. *Bancroft et al.,* 20 Vt. 257. The case of *Johnson* v. *Rand,* 6 N. H. 22, does not, in principle, conflict with these cases.

The opinion of the court was delivered by

Redfield, J.　In regard to the question, whether a grant of water privilege is ordinarily to be restricted to the particular use named in the grant, or the use is to be regarded as a measure of quantity, the rule laid down by Hall, J., in *Rogers* v. *Bancroft,* 20 Vt. 257, is no doubt sustained by the best considered cases in this country. And upon a subject of this character, from our altered situation, the American cases are, as a general thing, more applicable and more reliable, as authority, than the English cases.　In the case named the learned judge says, "There is undoubtedly an inclination in courts to construe grants of water liberally, so as to impose no unnecessary restriction upon its use ; and when the words used will admit of one construction, which would limit the use to a particular purpose, and another, which would allow the use specified to be merely a measure of the quantity to be used, the latter construction is adopted."　The reasons assigned by the learned judge, and which are relied upon in most of the cases upon this subject, in this country especially, namely, that such a construction is more favorable to the grantee and conduces most to "progressive improvement in water power," we may hereafter notice more fully.

The same general remark, in substance, is made by Shaw, Ch. J., in *Ashley* v. *Pease,* 18 Pick. 275, and the same general view is there somewhat more amplified, founded substantially upon the same ground.　The grant in that case, being for a fulling mill, was held to be restricted to the specific use.　And there is, perhaps, more reason to hold grants of water privilege, for driving machinery in

business which only occupies particular seasons of the year, and those, often, when there is ordinarily an excess of water, limited to that particular use, than in most other cases. And there is in this state almost no kind of business, coming so emphatically under this exception, as a custom fulling and cloth dressing business, or that was so at the date of the deeds, which came under consideration in the present case,—that business being at present but little known.

But even in that business, we should not be inclined to favor such a construction, unless the terms of the deed seemed very clearly to indicate such an intention, and the use had been uniformly consistent with such a construction. Many of the cases cited in argument, in favor of restricting the use, are of this character. *Strong* v. *Benedict,* 5 Conn. 210. The case of *Johnson* v. *Rand,* 6 N. H. 22, does not seem to make much in the case either way. The change there was only in the mode of applying the water power to the same use, and the wonder is, that any one should seriously have questioned the right to make such an alteration. The contrary rule would absolutely forbid all improvements in the use of water power. *Bigelow* v. *Battles,* 15 Mass. 313, is the case of the reservation of water sufficient to carry five thousand spindles in a cotton factory, to be thereafter erected; and the court held it to be a reservation of a quantity of water, which the party might apply to any use he thought proper. *Crowell* v. *Selden,* 3 Comst. 253, was the case of a reservation of water power sufficient to carry a grist mill with three runs of stones,—almost identical with the present. The court held, it did not restrict the use to that particular kind of machinery, but was only a measure of quantity.

We think, there can be no doubt as to the general rule of construction of grants of this kind; and that reservations are fully as much entitled to be considered a measure of quantity, as grants, for the reason that the general owner, in parcelling out a water power, would, as a general thing, be more likely to restrict others, than himself, having the power to do so.

We perceive, that one of the reasons, often urged in favor of such a construction of a grant, namely, that it is more favorable to the grantee, will not apply to the case of a reservation, but would, so far as it is entitled to any consideration, lead to a contrary conclusion. But that rule of construction is not properly applicable to

any case, but one of strict *equivocation*, where the words used will bear either one of two or more interpretations equally well.   In such a case, if there were no other legitimate mode of determining the equipoise, this rule might well enough decide the case.   In all other cases, where this rule of construction is dragged in by way of argument,—and that is almost always, where it happens to fall on the side, which we desire to support,—it is used as a mere make weight, and is rather an argument, than a reason.

But the prevailing reason for this construction is one of policy. It is all important to the interests of business, and to the proprietors of water power, that there should be as little restriction upon its use, as is consistent with the rights of other adjacent proprietors.   And where such restrictions are claimed, they should be shown by very explicit words in the grants, or reservations, supported by concurrent use, or else by long continued and uninterrupted occupation, which is, of course, equivalent to an express grant.

In regard to the testimony admitted at the trial, to show the declarations and claim of right of the defendants and those from whom they claim title, we have no doubt, that in a case, where the terms of a deed are equivocal, resort may always be had to such testimony.   But in the present case, although the testimony was received, no use was made of it, unless as a guide to the court, which does not appear, and which, if it did, would not be ground of error, if the construction finally adopted were consistent with the law.   No question was submitted to the jury in regard to these declarations,— which must have been the case, had not the court determined the construction of the deeds, as matter of law.   If that construction be not law, without regard to any testimony as to the defendants' declarations and claim of title, or that of those from whom they derive title, then there must be a new trial.

No question is made, but that the defendants had the right to water sufficient to carry two runs of stones in their grist mill.   And our reasons for regarding this as a measure of the quantity of water have already been sufficiently stated.   Whether the defendants can claim more than this is the only question of any intrinsic difficulty in the case, as it always appeared to us.   The words used in defining the reservation seem to limit it to two runs of stones; but from the circumstances in the case, and especially the fact, that at

the time of the reservation the defendants' grantor was in the actual use of more water, and had the power to reserve as much as he chose, he would scarcely be expected to seriously curtail the requisite quantity of water for his own mills already in operation, the value of which might be essentially diminished by such a step. It is supposable, that he might even consent to do this; but there is very little in the case to show any necessity for doing so, in order to secure adequate power to the factory, or any sufficient motive for the owner of the grist mill so to restrict its power, as essentially to cripple its operations. The conclusion, therefore, is almost inevitable, that the defendants' grantor did intend to reserve to the grist mill water, which, upon the whole, should be equal to its then present or prospective necessities, with the same extent of machinery then in operation. The quantity which should be measured by two runs of stones, with the right to use it constantly, if necessary, to afford the grist mill the same power then required by it, would accomplish all the objects, which the circumstances of the case seem to indicate as needful, to make the contract consistent with the propable purpose of the parties.

The result, therefore, to which we have finally come in the case, is, that the reservation for the grist mill was, what its terms indicate, such "*quantity* of water, as is necessary for the use of two runs of stones in the grist mill,"—the very words of the first reservation. And we think this must be the reservation referred to in the grant of the " additional privilege," as no one is bound to look out of his immediate chain of title to find conditions and limitations upon the title, when referred to in general terms. But we think, this exception, or reservation, is to be understood as of the date, when last used,—that is, the " quantity of water for two runs of stones " is to be used a sufficient portion of the time to do all the business then done in the grist mill, or which might reasonably be then expected to be done, without essential addition to the machinery. And in no event could the grist mill claim more water power, than the constant use of sufficient to carry two runs of stones. This construction seems to leave the matter in as definite a shape, as it could well be placed, and is more consistent with the words used, than any other, and seems to answer all the ends probably intended by the parties. And this " quantity," to this extent, it will be understood,

the defendants may apply to any use they desire, with this qualification, that while they continue the grist mill in operation, with the same machinery, or an equal amount, with that used at the time of the reservation, it ought to be presumed, as matter of fact, that this exhausts their right; and if they claim to run other machinery during the intervals of the use of the grist mill, the *onus* is upon them, to show very clearly, that, in the whole, they do not exceed their rightful use of the water power. So, too, if the defendants elect, at any time, to put their water power to a totally different use, it behooves them to see to it, that they do not exceed their rightful quantity of water. The parties having, at the time of the conveyance, mutually agreed upon a measure of the quantity of water to belong to each, when either departs from that *common measure*, he assumes the *onus* of showing, that he does not thereby exceed his rightful quantity of the water power.

It is impossible to regard the reservation of the first mill privilege, in the grant of the " additional manufacturing power," as an exception inconsistent with the grant, and therefore void. All reservations and exceptions, conditions, or limitations upon a grant, are of necessity, to a certain extent, inconsistent with the grant, in its most unlimited sense. And so is every qualification of a general form of expression. But it is not in any such sense, that an exception, by being inconsistent with the grant, becomes void. If an exception be of the whole thing granted, so that, by giving effect to the exception, the grant would become wholly inoperative, then it becomes certain the exception could not have been intended in that sense; and as it is impossible to know what it did mean, to save annulling the grant altogether the exception is held void. And so in all the cases, where any such rule of construction has been adopted, it has been for this reason, and as matter of strict necessity. As where one grants all his lands in a certain place, excepting certain lands, and has no other in that place ;—or as in the case cited in argument, —*Cutler* v. *Tufts*, 3 Pick. 277,—where the general terms used in the grant are, one half of a piece of land, described by metes and bounds, with this qualification, " meaning to convey one quarter." Either the grant or qualification here must fall; both cannot stand together.

We have not been able to perceive any real question, in regard to the saw mill privilege, which has come to the plaintiffs. It is obvious both the first and the second grant were understood by the parties in the same sense, as a grant of a *quantity* of water, sufficient to carry the saw mill. And we cannot perceive any necessity of taking any notice of it in the present action. It is certain, that if it were a grant of water for a particular use, which it is not, the diverting it from that use, in good faith, would not operate a forfeiture of the grant. So long as the title to that privilege remains in the plaintiffs, they can sustain no action upon any covenants running with the grant, where the breach complained of should be their own wrongful act; so that it seems to us, that, the title of that right coming into the plaintiffs, they may use that quantity of water to increase their privilege, if they do not encroach upon the rights reserved to the defendants.

We have not been able to find any such election, or long continued acquiescence in a particular use of the water, by the plaintiffs and their grantors, as will restrict them, in the exercise of their rights, below the fair construction of their deed. To have this effect, the grant should have been so far general, as to be wholly undefined on the face of the grant,—thus evidently looking to the use, as the grantee's own construction of his grant. Here there is nothing of this character. The plaintiffs, in terms, by the deed to their grantors, acquired the right to use water "at all times," for the purposes of manufacturing any and every kind and description of woolen, or cotton, or linen, or hemp, or silk goods, or manufactures." Here is nothing, which looks to any prospective election, in order to determine what residuum belongs to the grantor. It is literally all the water power he possessed, so far as it should, for all coming time, be needful, to the grantee, or his assigns, for the purposes named, or for other uses, not exceeding the same quantity. If the plaintiffs should ever propose to put this power to some other use, and to take more than they had ever used for manufacturing purposes, it is possible there might be some plausible argument raised, for limiting the quantity of water to the largest quantity, which ever had been used for the purposes specified in the grant;— but of this nothing need now be said.

This, as we suppose, disposes of the whole case, and upon grounds so nearly the same, as those upon which the case was put in the court below, that we·do not perceive any necessity for sending the case down for a new assessment of damages. And supposing that such a step would be attended with no beneficial consequences to either party, the judgment is affirmed.