RACHEL H. CRAM *vs.* PAUL CHASE.

JANUARY 20, 1913.

PRESENT: Johnson, Parkhurst, and Sweetland, JJ.

*(1) Waters. Easement.*

A. was the owner of a farm, on which was a spring about 1,000 feet from the house with an abundant supply of water. A. conveyed two acres of the farm to his son, B., with "the right to take water from my spring for his family use." By another deed he conveyed two acres to his son, C., with "the right to take water from the spring in my land west of his house, for his family use." Later he conveyed to his daughter, the complainant, thirty acres, including the homestead, with its barns, etc. The spring was not on this tract, but the deed gave complainant "also a privilege to take water from the spring on my farm as occasion may require." Later, A. divided up the remainder of his land—eight acres to complainant, bounding on the thirty-acre tract conveyed to her—twenty-six acres to B., bordering on the thirty-acre tract of complainant's, and one hundred and forty acres to C., bounding on the land conveyed to complainant and B., reserving a life interest in himself for certain purposes in all land conveyed under this last division. A. had used the spring for domestic and farm

purposes, the water being carried in buckets and barrels. For many years complainant lived with A. and supported him and herself by taking summer boarders, and during this time, while A. was the owner of the entire farm, they used the spring for all domestic and farm purposes. After complainant received the deeds of her portions, A. lived with her in the same manner as before until his death, fourteen years after the conveyance to complainant of the homestead tract. Complainant continued to run the house as a summer boarding house after the death of A. The husband of complainant installed a pumping plant on the eight-acre tract conveyed to complainant, and lying between and adjacent to her thirty-acre tract and C.'s land, and laid pipe across C.'s land to the spring and from the pump to a tank on complainant's land, with a branch pipe line to B.'s house. This was done about ten years after the conveyance to complainant and during the lifetime of A., while he was living with complainant and had a life interest in the land, where the spring was located, and with his approval. C. knew of the large expenditure made by complainant and her husband in this installation. C.'s land through which the pipe line was laid was worthless for cultivation. Although C. refused to sign a permission for the work he made no objection for seven years, when he took up the pipe:—

*Held,* that considering all of the circumstances surrounding the parties to the deed at the time of and prior to its execution; regarding the general terms of the grant to the complainant; the omission of the words "for family use," contained in the grants to the sons; the large tract of land conveyed to complainant and the fact that the father knew complainant was using the property for a summer hotel for their joint benefit, it was fair to assume that he intended to provide not only for the present, but for the future requirements of such business, and intended to give complainant a right commensurate with the interests to be served.

*Held,* further, that there was no limitation in the grant as to the method of taking the water, and under the circumstances of this case, complainant had the right to make use of the pipe line and was not limited to the use of buckets and barrels.

*Held,* further, that in view of the facts as to the use made by the grantor and by complainant with his approval of the water during many years for the hotel, and of grantor's approval of the installation of the plant, and of the fact that the pipe was laid through unproductive soil of defendant, and without objection by him for many years, there was a substantial agreement on the part of all parties concerned that access to the spring by means of the pipe was within the terms of the grant.

The grant of water easements carries with them by implication as secondary easements, everything that is beneficially necessary or incident to the grant whether mentioned or not as "privileges," "appurtenances," or the like. Of two constructions that will be selected which gives to such appurtenant privileges the more convenient and reasonable mode of enjoyment.

*Held,* further, that so long as complainant erected the pump upon her own land it was immaterial to defendant whether it was erected upon one lot

or the other, in the absence of evidence that the water was used upon the eight-acre tract.

*Held,* further, that the grant being to complainant "her heirs and assigns forever," with *habendum* to complainant "her heirs and assigns, to their own use and behoof forever," it conferred a right which would pass to the grantee's heirs and assigns.

BILL IN EQUITY. Heard on appeal of respondent and dismissed.

PARKHURST, J. This is a bill in equity, brought by Rachel H. Cram against Paul Chase, for an injunction to restrain the respondent from interfering with or preventing the complainant from entering upon the respondent's land and relaying a certain pipe to a spring thereon and from in any way interfering with or preventing the use by the complainant of the water of said spring, by means of said pipe.

The complainant, whose maiden name was Rachel H. Chase, and the respondent, Paul Chase, are the children of Daniel Chase, late of Portsmouth, deceased, and both reside on Prudence Island, in the town of Portsmouth. Daniel Chase once owned a large tract of land on said island upon which was situated his homestead with its barns, outhouses and surrounding acres of farm land. Upon this farm, about one thousand feet from the house, was an excellent spring affording an abundant supply of pure water at all seasons of the year. There were other sources of water supply, including a brook, seven or eight hundred feet from the house, which had very little water in the summer, also a well of water near the house which was apt to be dry in the summer, and was very little used, and of doubtful quality, and a cistern supplied with rain-water from the roof of the farm house, which at times had very little water. Daniel Chase used the spring freely for drinking and other domestic and farm purposes, for washing, watering stock, etc. During the time he owned the land, there was no pumping apparatus or pipe line on the premises, but water was carried from the spring in buckets and barrels.

In the year 1890, by deed dated and recorded November 26th, Daniel Chase conveyed two acres of this farm land to Halsey Chase, who was also one of his children. In this deed there are the following words: "And the said Halsey, his heirs and assigns, are to have the right to take water from my spring for his family use." . . . By another deed, dated and recorded December 9th, 1890, Daniel Chase quit-claimed to Paul Chase two lots of land from this farm, each containing one acre. In this deed, Paul Chase is also expressly given "the right to take water from the spring in my land, west of his house, for his family use.". . . By deed dated April 5th and recorded April 16th, 1892, Daniel Chase conveyed to Rachel Chase thirty acres of the said farm, including the homestead, with its barns, etc. The spring was not on this tract of thirty acres, but the deed expressly gives her "*also a privilege to take water from the spring on my farm as occasion may require.*" Then, in the year 1893, Daniel Chase divided up the remainder of his land, among his three children, by the following instruments: A deed to Rachel Chase, containing eight acres, bounding on the thirty-acre tract previously conveyed to her, reserving to himself during his life, the right personally and for his own benefit to cultivate any part or all said premises and to feed stock thereon. This was dated November 24th and recorded December 2nd, 1893. A deed to Halsey Chase, dated and recorded at the same time as the above, conveying twenty-six acres, bordering on the thirty-acre tract of Rachel Chase and containing the same reservation as the last mentioned deed. A deed to Paul Chase, dated and recorded at the same time as the above, conveying one hundred and forty acres, bounding on the land conveyed to Rachel Chase and Halsey Chase, with the same reservation of a life interest.

Up to the time of these deeds there had been no pumping apparatus upon any of these premises, but water from the spring had been carried in buckets and barrels, by the parties above mentioned, as they saw fit to use it. After the farm was divided up, the spring was on Paul's land,

the homestead with the brook and well and cistern, was on Rachel's land, and both Rachel and Halsey had such rights in the spring as Daniel Chase had given them in the deeds above mentioned.

The mother of Rachel H. Chase died about 1881, eleven years before the deed from her father to her of the thirty-acre tract of land April 5, 1892; and during all that time she was housekeeper for her father, and supported him and herself for nine years (1883–1892) by taking summer boarders, some twenty-five or thirty at a time; and during all this time her father being the owner of the entire farm and of the spring, she and her father freely used the water of this spring for watering the stock, for cooking and all domestic purposes in and about this farm and summer hotel, making little or no use of the well and cistern, which seem to have been of doubtful quality and entirely inadequate. The complainant continued to run the house as a boarding house or summer hotel after she received the deed from her father and he continued to live with her on these premises and to receive his support in part at least from the proceeds of the hotel, until his death in July, 1904. In the meantime, in 1895, the complainant married Madison H. Cram, and they (with the exception of about a year) lived in the house upon the thirty-acre tract conveyed to the complainant in 1892, and have continued to run the same as a summer hotel or boarding house down to the present time. Finding it increasingly difficult to secure sufficient pure water for the purposes of this farm and of the hotel thereon by the old method of carrying water from the spring in buckets and barrels, Mr. Cram in 1902, installed a pumping plant with a kerosene engine, on the eight-acre tract (conveyed to the complainant by deed, dated November 24, 1893, and lying between and adjacent to her thirty-acre tract, and Paul Chase's land); and having cleaned out the spring and built a concrete curb about the same, to keep out surface water, laid a pipe of one and one-fourth inches diameter from the pump to the spring,

about three hundred feet on Paul Chase's land, and from the pump to a tank on complainant's premises, another pipe of the same diameter, about seven hundred feet; and thereafter pumped the water from the spring to said tank, and through a branch pipe also to the house of Halsey Chase, who had the right to the use of water from the spring "for his family use," as above shown. The pipe from the spring was buried about two feet deep, on the land of the defendant. The plant cost upwards of $800, besides the labor of Mr. Cram, who superintended the work.

This pumping plant was installed in 1902, during the lifetime of said Daniel Chase, while he was still living with his daughter, Mrs. Cram, on the homestead farm, where they were taking boarders as above shown, and while Daniel Chase still had a life interest in the land where the spring was located, and met with his entire approval. It was known also to the respondent, Paul Chase, that the complainant and her husband were expending a large sum of money in this installation; he was at his home on the island at and during the time of the installation of the plant and must have known all about it. It is uncontradicted that the land in which this pipe is laid, within the limits of defendant's ownership, is a rocky side-hill, worthless for cultivation, and has never been cultivated. Although the defendant refused to sign any paper in relation thereto, he did not make any objection, either at the time of the installation or at or after the time of his father's death, until some time about the year 1909, when he learned that the complainant was selling water to some of the owners of the adjacent lots of land; and then for the first time he raised objection, and thereafter took up the pipe on his land, thereby cutting off the water from the pump. The complainant subsequently caused the pipe to be relaid, and filed this bill to enjoin the defendant from further interference with her right to keep and maintain the pipe to the spring. A preliminary injuction was granted upon hearing, as prayed in the bill; and thereafter, upon full hearing

before the Presiding Justice of the Superior Court, upon the pleadings and oral testimony a decree was entered June 19, 1911, whereby the defendant was "perpetually enjoined and restrained from interfering in any manner with the complainant and her heirs and assigns taking water from the spring situated on the said respondent's land described in said bill and from digging up, removing or in any manner interfering with the pipes laid by the complainant's pumping plant, and from preventing or hindering the complainant and her agents going upon the respondent's said land lying along said pipes and around said spring and repairing or relaying said pipes and cleaning said spring and repairing the curbing around it whenever it shall be necessary to do so, without prejudice to the rights of the respondent in other proceedings contesting the amount of water which the complainant may take from said spring and the purposes for which it may be taken."

It is to be noted that, by the last clause of the above quoted decree, it appears that other proceedings involving the questions as to the amount of water the complainant is entitled to take and the purposes for which it may be taken, are pending, and those questions are therefore not before this court at this time.

From the above decree the defendant seasonably claimed and perfected his appeal and thereon the case is now before this court.

The eleven reasons of appeal filed by the respondent may be condensed into the following:

1. That the court erred in finding that the language of the grant by Daniel Chase to the complainant of a privilege or right to take water from his spring "as occasion may require," gave her the right to take water therefrom by the pipe and pumping plant installed by her for that purpose:

2. That the court erred in admitting parol testimony for the purpose of explaining the language of grant of the

right to "take water from my spring *as occasion may require*:"

3. That the court erred in admitting parol evidence of the declarations of Daniel Chase as to the uses which he intended to make of the water of the spring upon the land owned by him and of the meaning of the language "as occasion may require" contained in said deed as showing the extent of the grant and the manner of its enjoyment:

4. That the court erred in not finding that the complainant was limited to the use of buckets and barrels in taking the water from said spring; and in finding that she had the right to lay and maintain a pipe across the respondent's land for the purpose of conveying the water to a tank located on the land first conveyed to her:

5. That the court erred in not finding that the fact that the complainant had located the pump by which the water was conveyed to the tank on her eight-acre lot instead of on the lot first conveyed to her, although no water from the spring has been used on the eight-acre lot affected her right to lay the pipe connecting the spring with the pump across the respondent's land:

6. That the court erred in finding that the grant contained in the deed to the complainant and her heirs and assigns of the privilege to take water "as occasion may require" is a right which may pass to the grantee's heirs and assigns.

The first and most important question thus raised is as to the construction to be given to the language of Daniel Chase in his deed to the complainant, wherein on April 5, 1892, he conveyed the thirty-acre tract of land; and after the description of the land uses these words: "also a privilege to take water from the spring on my farm, as occasion may require." In construing these words we must take into consideration first the significance of the words themselves; and we are entitled also to consider all of the circumstances surrounding the parties to the deed at

the time of and prior to the execution and delivery thereof. It is to be noted in the first place that in the granting of the right to take water from this same spring to each of his two sons, Daniel Chase uses the language, in the deed to Paul Chase, December 9, 1890, "the right to take water from the spring in my land west of his house, *for his family use*, and also the right to pass and repass *to and from the shore*, by either of my paths that I use for that purpose;" and in the deed to Halsey Chase, November 29, 1890, "the right to take water from my spring, *for his family use*, and also the right to pass and repass *to and from the shore* by either of my paths, that I now use for that purpose." The parties in their briefs have both fallen into an error in their attempt to limit these grants to the sons of the right to take water from the spring, by connecting therewith the language as to the use of the "paths that I now use;" it is manifest from a careful reading of both the deeds that the right to use these paths has nothing to do with the spring, but only gives a right of passage "to and from the shore," doubtless made necessary by reason of the fact that these small parcels of land were carved out of the farm and did not reach the shore to which access is manifestly necessary as giving access to the waters of the bay as the only highway connecting the island with the outside world. These grants of the right to take water from the spring to these two sons are therefore in the most general terms, of a right to take water, limited only by the words "for his family use." The grant to the complainant of "a privilege to take water from the spring on my farm, as occasion may require" is in still more general terms, and the omission of the words "for family use," is significant in view of the fact that a much larger tract of land is conveyed to the complainant, and in view also of the fact so well known to Daniel Chase that his daughter had used and was using the homestead house and farm for both his and her support in running a summer hotel. It is fair to assume that, in thus giving her the use of the water of the spring, he intended to pro–

vide not only for such use as she was with his full knowledge
then making of the water, for his benefit as well as for her
own, but also with an eye to the future requirements of the
business of keeping a summer hotel as indicated by the
words "as occasion may require," words which, in their
plainest and most obvious meaning, have reference to the
future and are susceptible of a very broad and liberal con-
struction.    It is not unfair to deduce from the circumstances
above set forth, in connection with the language used, that
the grantor had the intention of so making the spring sub-
servient to the purposes of the complainant as to give her
a right commensurate with the interests to be served.

The defendant broadly contends that while there is an
undoubted right in the complainant to take the water from
the spring, such right must be limited, as to method, to
that used commonly and customarily by the parties prior
to and after the conveyance, by means of buckets, barrels,
etc., and does not imply a right to lay and use a pipe, pump,
etc.   But the right granted is a "privilege to take water,"
and it is difficult to find an expression of more general
significance.    It will not be denied that water may be
"taken" by a pipe and pump as effectually as by a bucket
or barrel;  so that there is nothing in the significance of the
word "take" which of itself imports any limitation as to
the method of taking;  nor do the words "as occasion may
require" suggest any limitation as to the method of taking;
on the contrary, if it were necessary to regard these latter
words as having any relation to the method of taking, they
might be deemed to be rather in extension than in limitation,
and to imply that the method of taking in the future was
intended to be such as occasion might require, in view of
the use for which the water might be required.    The lang-
uage in all three of the grants by Daniel Chase to his
children is of a right or privilege "to take water," without
any limitation as to the method;  and it would have been
so easy to limit the right to take by reference to the ex-
isting methods of use or by some other express limitation,

that it is inconceivable that the grantor intended any such limitation. And this view is strengthened, if need be, by the fact that the grantor himself, while still in possession of the land and having a right to object, not only failed to object, but actually approved the installation; that his son Paul, the defendant, with full knowledge, failed to object until seven years after the installation; and by the further fact that the pipe was laid through a piece of rocky hillside unfit for cultivation and never cultivated, where there could be no appreciable damage to the owner.

The defendant's counsel seeks to sustain his position that there can be no implied secondary easement to maintain a pump with a pipe laid as an aqueduct from the spring in defendant's land, by the citation of certain authorities. But an examination of them satisfies this court that they are not applicable to the case at bar. In *Montana O. P. Co.* v. *B. & M. Co.* 20 Mont. 533, there was a grant of a right to flood and store water from a certain source upon a certain tract of land; the grantee attempted to bring water from another source by a pipe-line across grantor's land and to store this other water on the granted land; and it was held that this could not be done, as it was a manifest attempt to extend the granted right beyond proper limits. The case has no application to the case at bar.

In most of the other cases cited upon this point, there was already in existence, at the time the right to take water was granted or acquired, either a natural or an artificial water-way, ditch, flume or pipe in or by which the water to be taken had theretofore been taken by the grantee, and to the use of which it clearly appeared that the right was limited; and it was therefore held that there was no implied right to change the existing method of taking and to substitute another. See *Onthank* v. *R. Co.*, 71 N. Y. 194; *Myton* v. *Wilson*, 6 Pa. Sup. Ct. 293; *Schaffer* v. *Bank*, 37 La. Ann. 242; *Snyder* v. *Colorado &c. Co.* 181 Fed. 62; *Allen* v. *San José L. & W. Co.*, 92 Cal. 138; *Johnston* v. *Hyde*, 32 N. J. Eq. 446; *Oliver* v. *Agasse*, 132 Cal. 297.

The facts of these cases are of such varied character and so differ from those of the case at bar that we do not deem them of any weight in this consideration, and an extended review of them would be unprofitable.

The extent of an implied or secondary easement depends upon the purpose and extent of the grant of the primary easement. The rule is thus stated in Gould on Waters, at Sec. 306: "The grant of water easements carries with them by implication, as secondary or subsidiary easements, everything that is beneficially necessary or incident to the grant, whether mentioned or not as 'privileges,' 'appurtenances' or the like." . . . "Of two constructions that will be selected which gives to such appurtenant privileges the more convenient and reasonable mode of enjoyment."

"§ 318. Grants of rights to use water are to be so construed as to substantially secure the rights which appear to have been contemplated by the parties, and the literal reading of the conveyance will not be followed if a more liberal construction does not impair the rights of the other party."

A grant of the right or privilege "to take water" on the land of the grantor necessarily involves the right of access to the water over and upon the grantor's land. Access for the purpose of taking water from this spring had been by going to and fro on foot and by the use of buckets, also by driving with carts and barrels; but as there is no express limitation in the deeds as to the method of access, and as there is no doubt that the use of a pipe connected with a pump and drawing water from a spring is a most common and usual method of taking water, we are of the opinion that the method used by the complainant in this case, under all the circumstances, was fully warranted by the terms of the grant to her, and that the same method might have been used by her brothers, had they seen fit, under the grants to them. In view of the facts in evidence as to the use made by the grantor and by the complainant

with his concurrence and sanction of the water from the spring during so many years for the purpose of supplying the manifold necessities and conveniences of a summer hotel, and of his approval of the installation and use of the pumping plant, and of the further fact that the pipe was laid through rocky and unproductive soil on the defendant's property doing no substantial damage thereto, and without objection on his part for so many years, we are of the opinion that there was a substantial agreement on the part of all the parties concerned that access to the spring by means of the pipe as laid was a reasonable method of access, fully covered by the broad terms of the grant and was in no sense an enlargement of the privilege intended to be granted nor an increase of the burden upon the servient estate. It is impossible to conceive of a method by which water could be taken upon the land in question with less damage to the servient estate than by the means here employed. Very few cases have been cited by either party to this controversy which have a direct bearing upon this question, although a very large number have been cited upon general questions relating to water-rights and water-easements. We find a few, however, which seem to throw some light. In *Arnold* v. *Farr*, 61 Vt. 444, the owner of a spring had granted to the ancestor of defendant "one undivided sixth part of a certain spring and the aqueduct which conveys the water therefrom" to a certain dwelling house owned by grantors, "with full liberty to take said portion of the water running in said aqueduct from such point in said aqueduct as shall be most convenient, and conduct the same to his premises;" followed by provisions as to payment of expenses of repair and maintenance, etc. It appeared that the original grantee of this privilege had put in a branch aqueduct and conveyed the water to his premises, and that the defendant's one-sixth of the water had been so taken ever since. The defendant was about to put in an independent pipe from the spring to his buildings and the plaintiffs sought to enjoin him, claiming that the grant gave only

the right to take one-sixth of the water of the spring through the existing aqueduct, as it had been theretofore taken. The court says (p. 448): "But in this case there is no uncertainty in the deed. The extent of the grant is clearly defined, and the fact that the defendant and his grantor for many years drew their share from the stone aqueduct is not conclusive against defendant's right to take it directly from the spring by another aqueduct unless the words in the deed clearly or by necessary implication limit him to the former means, and we hold that they do not.

"This is in accordance with the reasoning of the court in *Adams* v. *Warner*, 23 Vt. 395, and *Rood* v. *Johnson*, 26 Vt. 64.

"The defendant has not drawn nor threatened to draw more than his share of the water, and though the master reports that there is no practicable way for the defendant to draw his one-sixth part by a separate pipe and be reasonably sure of getting his share and no more, we think that the orator's rights are not so imperiled by the defendant's proposed means of taking his share as to warrant the intervention of the Court of Chancery by its injunction or by an order for a division of the water according to the prayer of the bill."

In *Stevenson* v. *Wiggin*, 56 N. H. 308, a deed conveyed certain real estate, by description, which was followed by the words: "Also conveying the right to draw water from any and all the springs on said Clement's" (grantors) "land easterly and above the aforedescribed premises with the right to conduct the same by aqueduct to said premises for all uses and purposes forever." There were no structures on the land conveyed, at the time, and the springs were in their natural state. The grantees erected factories on the premises conveyed to them and entered on the grantor's land and built two reservoirs there for the purpose of collecting the waters of the springs. Plaintiff objected that defendant was given no right to pen up the water or build reservoirs, and sued in trespass *quare clausum*

for the injury done to the soil. After examining the evi-
dence of title and finding that on the true construction
of the language quoted above, the defendants were entitled
to take all the water from all the springs on the plaintiff's
land for the benefit of such business as should afterwards
be carried on upon the land, the court says, p. 311: "It
is further contended, that the deed gives only the right to
draw water from the springs. I am not sure that I under-
stand this point. The right to draw water from a spring,
one would think, must involve the right to make all such
arrangements as were needful in order to draw the water,
and the right to draw all the water must imply the right
to make such erections and arrangements as were necessary
for that purpose.

"It is further objected, that no right was given to the
defendants to pen up the water or build reservoirs; and, to
sustain this view, the case of *Walker* v. *Stewart*, 18 Law
Reporter (new series), 396 is cited. It appears to me that
that case has no application here. From the account given
of it in the argument, it would appear that in that case,
the quantity of water to which the party had a right was
drawn in question. That quantity being regulated by
the size of the pipe through which it was drawn, the court
held that the quantity was limited to so much water as
would run through the pipe without increasing its head
by a dam. I have no doubt that the construction of that
deed was correct,—but in the case under discussion the
defendants have a right to all the water, if taken in good
faith, to be used upon the land; and the only question is,
whether the defendants have a right to use the necessary
means in order to avail themselves of all the water.

"The court has found that the defendants, in good faith,
require all the water to be used on the land, and that they
have done what is proper, and no more than what is
reasonably right and proper, in order to avail themselves
of it.

"I understand that the adaptation of suitable means for

the purpose of utilizing the water of springs is a matter of skill. Sometimes, when the water makes its appearance in a single jet or stream coming out of a hard bank, or a cleft in a rock, the arrangements may be very simple. In other places, where the water seems to be more diffused, oozing as it were out of a considerable surface, and gradually collecting into a stream, a different and more elaborate if not more complicated arrangement is required. I do not see how this case can be matter of law. I do not see how the court can ever undertake as matter of law, to say that one arrangement is proper and another improper. It must in all cases be a matter of fact, to be determined by the application of the requisite skill and experience. This being so, and the court having found, as matter of fact, that the defendants have done nothing more than was reasonably necessary for the purpose of saving and using all the water, in good faith, required by them for their works, situated on their land, to which this right to take water was made incident by the conveyance, it appears to me that the action cannot be maintained."

And after quoting well known maxims of the law to the effect that "whoever grants a thing is supposed also tacitly to grant that without which the grant itself would be of no effect," the court proceeds in conclusion to say, p. 313:

"The doctrine, so fully and clearly expressed in the above extract, is so well established as to be elementary. The only difficulty, if any difficulty there be, is in the application.

"I cannot, however, find any real difficulty in the present case. The means used, and the interference with the land, seem to be not at all disproportionate to the importance of the right granted; and, on the whole, I feel quite clear that there should be judgment for the defendant, without the necessity of considering at all the question as to the form of action."

The principles involved in the decision of the two cases last cited, seem to be quite opposite to those involved in the

case at bar; the complainant built a concrete curb about the spring to keep out surface water, and this would also tend to keep the water of the spring pure and free from leaves, sticks, dirt and other rubbish, as well as to keep the flow of the spring from wearing away the soil, by holding the soil in place about the spring permanently and avoiding the need of frequent repair, and is analogous to the building of the reservoir in the *Stevenson* case; while the building of the pipe-line to the pump and tank, for the purpose of taking the water to the complainant's tank for her use is very similar to the act of the defendant in *Arnold v. Farr*, in building a new and separate aqueduct, although there was one already in existence from which he had always taken his share of the water; and it is to be noted that in the latter case it was held that the fact that the defendant had always theretofore used the existing aqueduct did not so measure and define his right as to prevent him from building a new aqueduct if he saw fit.

In thus coming to the conclusion that the complainant had the right to install the pipe and connect it with a pump as incident to the grant in such broad and general terms of the "privilege to take water," under the circumstances above set forth, we have relied upon the language of the grant itself, and upon the undisputed facts of the case, and have not found it necessary to rely in any degree upon the evidence offered by the complainant and objected to by the defendant, as to the intentions of Daniel Chase regarding the installation of a pump, or as to what he said in relation to the meaning of his language in the grant. We think it is plainly evident upon the undisputed facts that it was his intention to permit the complainant to do as she has done. It therefore becomes unnecessary to discuss the questions as to the admissibility of certain testimony as suggested by the defendant in the second and third paragraphs of the defendant's objections above set forth. And as to the objections to the decree set forth in the first and fourth paragraphs, we are of the opinion that the justice

of the Superior Court did not err in finding that the complainant had the right to take water from the spring by a pipe and pumping plant and that she was not limited to the use of buckets and barrels. We do not mean it to be understood by this that, as a general rule and under all circumstances, it should be inferred that a grant of a right to take water necessarily involves a right to use a pump and pipe. As shown in many of the above cited cases, there may be such limitations express or implied, or such circumstances as to show that such a right is not to be inferred, and would be unreasonable and unduly burdensome to the servient estate.

The defendant further contends that the location of the pump upon the eight-acre lot, instead of the thirty-acre lot, affected complainant's right to lay the pipe upon the defendant's property. We find that the question sought to be raised by this contention is wholly immaterial. So long as the complainant erected the pump upon her own land at a convenient point in the pipe-line to effect her purpose, it is of no consequence to the defendant whether she erected it upon one lot or the other. The pump is merely one part of the plant, and if it were necessary or convenient to erect the pump upon the eight-acre lot for mechanical reasons as being the highest point to which the water must be raised from the spring so as most conveniently to get it to the complainant's tank (as may be inferred from the evidence), it is at all events of no consequence to the defendant and no ground of objection on his part, in the absence of any evidence that the water was used upon the eight-acre tract.

The sixth contention above set forth that the court below erred in finding that the grant to the complainant of the "privilege to take water from the spring" conferred a right which would pass to the grantee's heirs and assigns, is without merit, in view of the plain language of the deed. The grant is to "Rachel H. Chase, her heirs and assigns, forever " . . . ; and the *habendum* is

"to the said Rachel H. Chase and her heirs and assigns, to their own use and behoof forever." The defendant's counsel is plainly in error when he urges that the words "heirs and assigns" are not "connected with the giving of the water right to the complainant." The deed is plain upon its face, and there is no room for inference or construction. There was no error in framing the decree so as to protect the complainant and her heirs and assigns.

We have not found it necessary to consider the question whether the defendant is estopped by his long acquiescence in the maintenance of the pipe-line, from contesting the complainant's right so to maintain it, for the reason, as set forth above, that in our opinion the grant is in such broad and general terms that under the circumstances of the case a grant of the right to take the water by a pipe may be inferred; and the only effect which we have given to the defendant's acquiescence has been as to the reasonableness of such an inference in view of the undisputed facts and of the general concurrence of all the parties in interest.

A part of the argument concerns the question whether the complainant's right to take water from the spring is an easement in gross, or is appurtenant to the thirty-acre tract. In view of the reservation in the decree of all questions relating "to the amount of water which the complainant may take from the spring and the purposes for which it may be taken," we are of the opinion that the question whether the complainant has an easement in gross or appurtenant will necessarily be involved in the determination of those reserved questions, and is not now before us.

We find no error in the decree appealed from. The appeal is dismissed, the decree of the Superior Court is affirmed, and the case is remanded to the Superior Court sitting in and for the county of Newport for further proceedings.

*Littlefield and Barrows,* for complainant.

*Lewis A. Waterman and Ernest P. B. Atwood,* for respondent.